UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| CURLEY CULP, JOHN RIGGINS, RON YARY, DAVE CASPER, THOMAS MACK, PHIL VILLAPIANO, ROMAN GABRIEL, JR., WILLIE BUCHANON, JOSEPH KAPP, and MIKE BASS, on behalf of themselves and all others similarly situated, | Civil No. |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| NFL PRODUCTIONS LLC d/b/a NFL FILMS; and NATIONAL FOOTBALL LEAGUE, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................... 1

II.     PARTIES ................................................................................................. 6

        A.      Plaintiffs .................................................................................... 6

        B.      Defendant ................................................................................. 18

III.    JURISDICTION AND VENUE ............................................................ 19

IV.     FACTUAL ALLEGATIONS ................................................................ 23

        A.      The NFL and its Commercial Brand......................................... 23

        B.      The Importance of NFL Films to the NFL's Commercial Brand ...................... 28

        C.      The NFL's Use of Retired Players' Identities to Earn Revenue ....................... 34

        D.      Plaintiffs' Publicity Rights are Extremely Valuable................. 38

        E.      NFL Films Does Not Provide Neutral Reporting ................... 41

        F.      NFL Films Does Not Constitute Protected Art....................... 45

        G.      Products and Revenue Streams................................................ 45

        H.      Examples of NFL Films' Unfair Competition ....................... 49

        I.      The NFL's Likely Defenses are Inapplicable ......................... 58

V.      CLASS ACTION ALLEGATIONS ...................................................... 59

        A.      NFL Films' Massive Amount of Footage............................... 59

        B.      NFL Films' Cutting-Edge System for Identifying Players in NFL Films' Footage ...................... 60

        C.      NFL Films' Detailed Licensing Criteria ............................... 64

        D.      Specific Class Action Allegations ......................................... 65

VI.     NFL FILMS' ROLE IN THE PHILADELPHIA FEDERAL COURT CONCUSSIONS LITIGATION AGAINST THE NFL ............................ 68

VII.    TOLLING OF STATUE OF LIMITATIONS DUE TO DRYER CASE ............ 71

VIII.   COUNTS .............................................................................................. 71

10376-11 629014V1

COUNT I  Violation of New Jersey Common Law of Unfair Competition..............................71

COUNT II  Violation of New Jersey Common Law Regarding Rights of Publicity ................72

COUNT III  False Endorsement § 43(a) of the Lanham Act, 15 U.S.C. § 1125 .......................72

COUNT IV  Violation of Right of Publicity, California Civil Code § 3344..............................75

COUNT V  Violations of Right of Publicity, California Common Law ....................................76

COUNT VI  Violations of State Right of Publicity Statutory and Common Laws....................76

COUNT VII  Unjust Enrichment ..............................................................................................78

PRAYER FOR RELIEF ...........................................................................................................78

JURY DEMAND ......................................................................................................................80

10376-11  629014V1

Plaintiffs Curley Culp, John Riggins, Ron Yary, Dave Casper, Thomas Mack, Phil Villapiano, Roman Gabriel, Jr., Willie Buchanon, Joe Kapp, and Mike Bass (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants NFL Productions LLC d/b/a NFL Films ("NFL Films") and the National Football League ("NFL") (collectively, "Defendants").  Plaintiffs assert claims herein on behalf of all of those former NFL professional football players, and their heirs and assigns, that have formally opted-out of a proposed class action settlement in litigation captioned *Dryer v. National Football League*, Case No. 09-CV-2182 PAM, United States District Court for the District of Minnesota (collectively, "Class Members").  Plaintiffs, through counsel, allege as follows:

## I.    INTRODUCTION

1.      Defendant NFL Films is an entity headquartered in this District in New Jersey, and it has engaged in a calculated and systematic pattern and practice of widespread acts of unfair competition and other violations of law adversely affecting the interests of former NFL players.  Those acts include using Class Members' images, without their permission or consent, in NFL Films' promotional materials and products to increase revenue and profits for Defendants and their affiliated entities.

2.      Plaintiffs, as described in more detail herein, (1) include five members of the professional football Hall of Fame; (2) include five members of Super Bowl champion teams; (3) collectively made appearances in eleven Super Bowls; (4) include the recipients of the Super Bowl Most Valuable Player ("MVP") and regular season MVP awards; (5) competed for an average of 11.9 seasons in the NFL; (6) played a collective total of 119 seasons in the NFL,

10376-11  629014V1

playing in close to 2,000 games; and (7) collectively were selected to play 40 times in the Pro Bowl, the NFL's All-Star game.

3.    The National Football League ("NFL") is ubiquitous in contemporary American media culture. At any given time – day or night, during the season or not – one would be hard-pressed to flip through the television channels for long without encountering at least one representation of the NFL, from recaps of games to commercials that somehow feature the league. Many of these images derive from a single site, the NFL Films archive. Since 1965, NFL Films, the NFL's subsidiary film production company, has documented every one of the league's games and filmed thousands of interviews with its players and coaches. It uses this footage to create products that it sells to the public. The company now possesses the world's largest sports film archive, which is located at its headquarters in Mount Laurel, New Jersey. This mammoth collection constitutes the starting point from which NFL Films manufactures its promotional materials and licenses film to other media outlets.

4.    NFL Films is a spectacularly successful in-house production company owned by the NFL. NFL Films creates and distributes advertising and promotional materials for the NFL designed to assist the NFL in developing and expanding the NFL's self-described commercial "brand," both nationally and internationally. To put it another way, NFL Films is a captive, in-house advertising agency for the NFL's "brand," no different than, for example, the Walt Disney Company's "Yellow Shoes Creative Group," which identifies itself as "the full-service, in-house advertising agency for the Walt Disney Company." NFL Films performs the identical function for the NFL, and seeks to stimulate consumer purchases of, for example, NFL game tickets, television subscriptions to the NFL's various television channels, NFL branded apparel, and a myriad of other branded merchandise.

- 2 -

5.      A corporate "brand" is simply a euphemism for the ability to earn money, and in the NFL's case, a staggering amount of it.  In May of this year, New Jersey's nj.com reported that the NFL's annual revenue was $9.5 billion.  Former NFL players, however, have not participated in the staggering success of the NFL's brand, and without Court intervention, they will not.  Former NFL players have created a promotional asset that literally lives forever.  The NFL has refused to pay *anything* for the continued use of the asset created by former players, namely, a fair and reasonable royalty for using their images.

6.      NFL Films conducts its business in part by utilizing raw footage of former players taken from its voluminous archive of filmed professional football games and related events, and develops brand new promotional and marketing products based on that footage.  NFL Films' raw footage is *not* to be confused with footage from live broadcasts of games produced by, for example, the television networks FOX, ESPN, NBC, CBS or ABC.  NFL Films *separately* has comprehensively filmed every NFL game for numerous decades for the specific, targeted purpose of creating promotional products, and from those materials NFL Films has assembled promotional materials to assist the NFL in developing the NFL's brand.

7.      NFL Films has never obtained authorization from retired players to use their images to be, as NFL Films puts it, the "backbone" of the "NFL Network," the national (and in fact international) television network that the NFL created in late 2003.

8.      NFL Films' conduct goes far beyond simply use of images without consent.  It continues to this day to strike licensing business deals, in New Jersey, affirmatively, and falsely, misrepresenting that it has obtained all former players' consent to appear in its promotional materials.  The NFL does likewise.  For example, in July of 2009, it struck a deal with IMG Worldwide to license the international distribution of the NFL Network.

9.      NFL Films has unlawfully foreclosed Class Members from receiving compensation in connection with NFL Films' commercial exploitation of their images. Moreover, unless restrained by this Court, NFL Films will continue to do so into the future.

10.     The value generated by NFL Films is staggering.  Published reports back in 2002 estimated that it was reaping $50 million annually in licensing revenue, and was growing at a double-digit rate.  That number *only* accounted for licensing to third-parties, such as television networks.  It did *not* include the far greater value to NFL Films, and the NFL itself, to use NFL Films' footage to promote the NFL's global brand, and to form the "backbone" of the NFL Network.  In 2009, the State of New Jersey's Board of Public Utilities issued a press release regarding the State's grant of an energy rebate to NFL Films.  The release quoted Barry Wolper, Vice President of NFL Films, as stating that "NFL Films is the world's largest sports film library, containing more than 100 million feet of NFL archival footage.  While the collection amounts to millions of dollars worth of film, the memories associated with these legendary games and plays are priceless."

11.     The founder of NFL Films described the collection of the players' images follows:

> "Those [NFL Films] archives constitute the soul of professional
> football, the stored treasures of football's wine cellar."

12.     The bottles in this wine cellar are the players' images, individually and collectively, which have not been paid for.

13.     NFL Films has no valid affirmative defenses for its conduct.  It does not enjoy First Amendment protection, as its works are "commercial speech."  As a federal court of appeals held last month in a case against video-game maker Electronic Arts when rejecting a First Amendment defense, "[h]aving chosen to use the players' likenesses, EA cannot now hide

- 4 -

behind the numerosity of its potential offenses or the alleged unimportance of any one individual player." Those words are equally applicable here. Moreover, any First Amendment defense is thoroughly debunked by an accounting firm's audit report for NFL Films in 2010. It revealed that the NFL is *separately* paying current players $10,000,000 or more per year in something called the "Internet Agreement" by which the NFL was "granted a group player license that includes the right to use player names, their likeness and other publicity rights in the promotion of its internet sites." These are *exactly* the types of promotional rights that the NFL and NFL Films should be separately paying for with respect to Class Members, but they refuse to do so because of former players' perceived powerlessness.

14.     Plaintiffs' claims readily lend themselves to Court certification of this matter as a class action. As detailed herein, NFL Films' cutting edge "SABER" computer system, and other data sources, allow for the hyper-advanced identification of Class Members' images used in NFL Films' promotional products. Moreover, the Court also has the discretion to manage this litigation pursuant to Federal Rule of Civil Procedure 23(c)(4), which states that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues."

15.     Defendants' conduct has violated, and continues to violate, Plaintiffs' rights of publicity and other statutory and common laws. As a result of these violations, Plaintiffs now bring this class action seeking compensation for Defendants' past unauthorized use of the identities of retired NFL football players, and to stop this egregious misconduct going forward.

## II.      PARTIES

### A.      Plaintiffs

16.      Plaintiff **Curley Culp** is a resident of Texas.  He is a former NFL professional football player and a member of the proposed Class set forth herein.  Plaintiff Culp, this month on August 3, 2013, received the sport's highest honor and was inducted into the professional football Hall of Fame as a member of the newest class of inductees.  He played professionally as a defensive lineman in the American Football League ("AFL") (subsequently merged with the NFL in 1970) and NFL for fourteen (14) seasons from 1968 to 1981 for the Kansas City Chiefs, Houston Oilers and Detroit Lions NFL member teams.  Plaintiff Culp was a key member of the Kansas City Chiefs team that won Super Bowl IV in 1970.

17.      Plaintiff Culp was selected as an All American in his collegiate football career at Arizona State University, and while there also was an All American wrestler, and the NCAA heavyweight champion in wrestling.  In the NFL, Plaintiff Culp received numerous individual honors in his highly-distinguished professional career.  He was selected to the AFL's All-Star team in 1969, and was selected five (5) times to participate in the NFL's Pro Bowl, its yearly all-star game for the best players in the sport.  Plaintiff Culp was selected as a member of the NFL's first-team All-Pro team in 1975, and selected to the second-team in 1971, 1977, 1978 and 1979. He was selected first- or second-team All-AFC (one of the NFL's two conferences) five times. Plaintiff Culp in 1975 had arguably his finest individual season, as he was credited with 11.5 quarterback sacks and was named the NFL's Defensive Player of the Year by the Newspaper Enterprise Association.

18.      *Sporting News* named Plaintiff Culp to the All-Century teams for both the Kansas City and Houston / Tennessee NFL teams.  In January 2008, Plaintiff Culp was voted by a panel

of former NFL players and coaches to *Pro Football Weekly* 's All-Time 3-4 (a defensive formation) defensive team along with Harry Carson, Lawrence Taylor, Randy Gradishar, Howie Long, Lee Roy Selmon, and Andre Tippett.  Also in 2008, Plaintiff Culp was inducted into the Kansas City Chiefs Hall of Fame.

19.     Plaintiff Culp's image and identity continues to have value, including as a visible and active community member.  He has been a longtime Special Olympics advocate in Houston, and also has supported through charitable events the United Way, the American Lung Association, and the Make-a-Wish Foundation.

20.     Defendants have used, and will continue to use unless enjoined, Plaintiff's Culp image and identity for promotion without his permission and without compensation.

21.     Plaintiff **Robert John Riggins** ("John Riggins") is a resident of Maryland.  He is a former NFL professional football player and a member of the proposed Class set forth herein.  In 1992, Plaintiff Riggins received the sport's highest honor and was elected to professional football's Hall of Fame.  He played professionally as a running back in the NFL for fourteen (14) seasons from 1971 - 1985, his first five with the New York Jets, and the remainder with the Washington Redskins.  Plaintiff Riggins was selected as the Most Valuable Player in Super Bowl XVII in 1983 after the Redskins prevailed, and he finished the game with two Super Bowl records:  the most rushing yards in a Super Bowl game (166), and the most rushing attempts (38). His performance was also his fourth 100-yard rushing game in a row in a playoff game, a postseason record.  He also played in Super Bowl XVIII in 1984 and scored a touchdown.

22.     Plaintiff Riggins was voted on to the All America team in his collegiate football career at the University of Kansas.  In the NFL, Plaintiff Riggins carried the ball 2,916 times, gained 11,352 rushing yards, had another 2,090 receiving yards, scored 104 rushing touchdowns,

and another 12 receiving touchdowns.  He rushed over 1,000 yards in a season five times in his career and over 100 yards in 35 games, including a then-record six in playoff games.  In nine playoff games, he rushed 251 times for 996 years and 12 touchdowns.  In 1983, he rushed for an NFL record 24 touchdowns.  He was the second player to ever rush for over 100 touchdowns in NFL history, and to this day is among the NFL all-time leaders in numerous statistical categories.

23.     He was selected to play in the 1976 Pro Bowl, and was selected to the All-NFL team in 1983.  In 1983 he also was awarded the NFL's Bert Bell Award recognizing the player of the year.  The professional football Hall of Fame's voters selected Plaintiff Riggins to the NFL 1980s All-Decade Team, and he also was elected to the Washington Redskins Ring of Fame.

24.     Plaintiff Riggins' image and identity continues to have value, including as a visible and active community member.  He has supported military charities for many years, beginning during his football playing career.  He works with the USO in Washington, DC, visits Walter Reed Army Hospital, and in the early 2000's began "Riggo's Rangers Foundation" to aid wounded military veterans and their families.

25.     Defendants have used, and will continue to use unless enjoined, Plaintiff Riggins' image and identity for promotion without his permission and without compensation.

26.     Plaintiff **Anthony Ronald Yary** ("Ron Yary") is resident of California.  He is a former NFL professional football player and a member of the proposed Class set forth herein. Plaintiff Yary received the sport's highest honor and was elected to the professional football Hame of Fame in 2001.  He also is a member of the College Football Hall of Fame and the Rose Bowl Hall of Fame in recognition of his outstanding career at the University of Southern

California ("USC"), where he also was named to multiple All America teams and won awards as the nation's top lineman.  He played professionally as an offensive lineman in the NFL for fifteen (15) seasons from 1968 – 1982 with NFL member team the Minnesota Vikings for his first fourteen (14) seasons, and with NFL member team the Los Angeles Rams for the 1982 season.

27.     Plaintiff Yary was the first overall pick of the 1968 NFL Draft by the Minnesota Vikings, becoming the first offensive lineman ever to be selected first overall, and it would be 29 years before another offensive lineman would be drafted first overall.  During Plaintiff Yary's career with the Vikings, the team won eleven (11) division titles. During that period, Minnesota won NFC titles in 1973, 1974 and 1976, and played in Super Bowls IV, VIII, IX and XI. Plaintiff Yary was named to the NFL's All-Pro team six (6) consecutive seasons (1971–76), named to the 2nd Team All-Pro team in 1970 and 1977, and was selected to the All-NFC team from 1970 through 1977.  He was selected to play in seven consecutive Pro Bowls.  Plaintiff Yary additionally was voted the NFC Offensive Lineman of the Year three times (1973–75) by the NFLPA.  He missed only two games due to injuries in 14 years in Minnesota.  The professional football Hall of Fame's voters selected Plaintiff Yary to the 1970s All-Decade Team, and he was inducted to the Vikings Ring of Honor in 2000.

28.     Plaintiff Yary's image and identity continues to have value, including as a visible and active community member.  He started the Legacy Leadership Project in 2007, a program to mentor high school football players.  Each year, the players are flown to Canton, Ohio to participate in the professional football Hall of Fame induction ceremonies, and then mentored by a Hall of Fame player throughout the football season.  Plaintiff Yary also is a speaker and

presenter for the Be The Match Foundation, where he speaks with college athletes about the importance of donating bone marrow to save lives.

29.     Defendants have used, and will continue to use unless enjoined, Plaintiff's Yary's image and identity for promotion without his permission and without compensation.

30.     Plaintiff **David John Casper** ("Dave Casper") is a resident of Minnesota.  He is a former NFL professional football player and a member of the proposed Class set forth herein. Plaintiff Casper received the sport's highest honor and was elected to the professional football Hall of Fame in 2002.  In 2012, he was elected to the College Football Hall of Fame for his illustrious career at Notre Dame where he was selected to the All America team.  He played professionally as a Tight End in the NFL for eleven (11) seasons from 1974 to 1984, including his first six (6) and a half seasons for NFL member team the Oakland Raiders.  Plaintiff Casper was a key member of the Raiders team that won Super Bowl XI in 1977, and he scored the first touchdown in the game.

31.     Nicknamed "The Ghost," Plaintiff Casper was named to the NFL's All-Pro and All-AFCS teams for four (4) consecutive years in the 1976 – 1979 seasons, and was selected to participate in five (5) Pro Bowls.  His career statistics include 378 pass receptions for 5,216 years, and 52 touchdowns.  At the time of his retirement in 1984, he was tied for first place in the NFL record book for most touchdowns by a player in a playoff game, having scored three (3) against Baltimore in 1977.  The professional football Hall of Fame's voters selected Plaintiff Casper to the 1970s All-Decade Team.  In 1991, Plaintiff Casper was selected to the NFL's Super Bowl Silver Anniversary Team commemorating the top performers from the NFL's first 25 Super Bowls.  He also was selected as the Tight End on *Sports Illustrated*'s All-Time Dream Team.  While introducing Plaintiff Casper at his induction into the professional football Hall of

10376-11  629014V1

Fame, legendary Oakland Raiders coach and television broadcaster John Madden stated the following: "Dave Casper was a great tight end, and the best tight end that ever played."

32.     The professional football Hall of Fame states the following regarding Plaintiff Casper: "Two of the game's most memorable plays involved the sure-handed tight end. In the 1977 AFC playoff game between the Raiders and the Baltimore Colts, it was Casper's 10-yard touchdown reception that ended the double-overtime affair, 37-31, in favor of the Raiders. 'Ghost to the Post,' the game is called in reference to Casper's 42-yard reception route that set up the tying field goal at the end of regulation. Early the next season, Casper again pulled his team from certain defeat, on a play that would forever be remembered as 'The Holy Roller.' Down six points to the San Diego Chargers with 10 seconds remaining in the game, Raiders quarterback Ken Stabler fumbled the ball. The ball rolled 13 yards to the Chargers 11, where running back Pete Banaszak batted it toward the goal line. At the 5, a quick thinking Casper continued the ball's forward progress with his foot before finally falling on it in the end zone for the game-winning touchdown." Both plays have been used often in NFL Films highlights to promote the NFL and on the NFL Network.

33.     Plaintiff Casper's image and identity continues to have value, including as a visible and active community member. Plaintiff Casper's image and identity continues to have value, including as a visible and active community member. Now living in Cottage Grove, MN, he serves as a financial advisor for Northwestern Mutual Life Insurance. He is a member of the Sports Faith International (a Chicago-based initiative dedicated to inspiring and transforming culture through sports) Hall of Fame in Lake Forest, IL. He also is involved with fundraising projects through several Notre Dame alumni clubs, and he works with the Cristo Rey Network

(comprised of 24 Catholic college prep schools for urban young people with limited educational options).

34.     Defendants have used, and will continue to use unless enjoined, Plaintiff Casper's image and identity for promotion without his permission and without compensation.

35.     Plaintiff **Thomas Lee Mack** ("Tom Mack") is a resident of Nevada.  He is a former NFL professional football player and a member of the proposed Class set forth herein.  In 1999, Plaintiff Mack received the sport's highest honor and was elected to the professional football Hall of Fame.  Plaintiff Mack attended the University of Michigan, where he played collegiate football and was named to the All America team.  He played professionally in the NFL as an offensive lineman for thirteen (13) seasons from 1966 to 1978, all of them with the Los Angeles Rams.  Plaintiff Mack was the second overall pick in the 1966 NFL draft.  He never missed a game during his 184 game career.  He was selected to participate in eleven (11) Pro Bowls, and was named to the All-Pro first team five times, and to the All-NFC team eight times.

36.     Plaintiff Mack's image and identity continues to have value, including as a visible and active community member.  He has been involved with the Boy Scouts of America ("BSA") for more than 40 years, and assists in channeling donations and support directly to them at a local, council or district level.  He has served on numerous BSA Council Boards in several states, and continues to support them today via various fundraising efforts.  Plaintiff Mack also supports and assists the Salvation Army and local food banks in the Henderson, Nevada area.

37.     Defendants have used, and will continue to use unless enjoined, Plaintiff Mack's image and identity for promotion without his permission and without compensation.

38.     Plaintiff **Philip James Villapiano** ("Phil Villapiano") is a resident of New Jersey.  He is a former NFL professional football player and a member of the proposed Class set forth

herein.  In college, Plaintiff Villapiano starred at Bowling Green State University where he was voted the conference player of the year.  He played professionally as a linebacker for thirteen (13) seasons from 1971 to 1983, the first nine (9) of those seasons with the Oakland Raiders, and the remaining seasons with the Buffalo Bills.  He was a member of the Oakland Raiders team that won Super Bowl XI in 1977.  He was selected to play in four (4) Pro Bowls, and also was selected as AFC Defensive Rookie of the Year in 1971.

39.     In 2002, Villapiano made the list of preliminary nominees for the professional football Hall of Fame.  In 1990, he was inducted into the National Italian American Sports Hall of Fame.

40.     Plaintiff Villapiano's image and identity continues to have value, including as a visible and active community member.  He has worked in the transportation industry for 35 years, currently as Vice President - Sales of Odyssey Logistics & Technology based in Danbury, CT.  He is a founder and board member of The Foundation to Save the Jersey Shore, a 501(c)(3) grassroots local effort to provide relief for families, businesses and municipalities affected by Superstorm Sandy.  He has been involved with the Muscular Dystrophy Association over the past forty years, most recently as an MDA National Vice President and founder of The Phil Villapiano Field of Hope Gala which raised funds for ALS research for 16 years.  In 2002, the V Foundation for Cancer Research, formed by the inspirational late North Carolina State basketball coach Jim Valvano, awarded to Plaintiff Villapiano the "The Jimmy V Don't Ever Give Up Award" in 2002 "For embodying the persevering spirit of both the 'V' Foundation and Jim Valvano."  Plaintiff Villapiano also a past board member of The Boys & Girls Clubs of Monmouth County.

41.     Defendants have used, and will continue to use unless enjoined, Plaintiff Villapiano's image and identity for promotion without his permission and without compensation.

42.     Plaintiff **Roman Ildonzo Gabriel, Jr.** ("Roman Gabriel") is a resident of North Carolina.  He is a former NFL professional football player and a member of the proposed Class set forth herein.   Plaintiff Gabriel played as a quarterback in the NFL for sixteen (16) seasons from 1962 to 1977, playing from 1962 – 72 with the Los Angeles Rams, and from 1973 – 77 with the Philadelphia Eagles.  In college at North Carolina State University, Plaintiff Gabriel was a two-time All-American and two-time Atlantic Coast Conference ("ACC") Player of the year. In 1989, he was inducted into the College Football Hall of Fame.  In 2003, the ACC's 50th Anniversary Football Team was announced and Plaintiff Gabriel was listed among the top 50 players in the history of the ACC.

43.     In 1962, Plaintiff Gabriel was the first overall pick in the AFL draft, and the second overall pick in the NFL draft.  He won the NFL's Most Valuable Player award in 1969, and was selected to play in the Pro Bowl four times, in 1967, 1968, 1969, and 1973.  He also was named to two All-Pro teams.  In 1973 he won the NFL's Comeback Player of the Year award.

44.     The son of a Filipino immigrant, he was the first Asian-American to start as an NFL quarterback and is considered by many to have been one of the best players at that position during the late 1960s and early 1970s.  In his NFL career, he passed for 29,444 yards and 201 touchdowns.  He still holds the Rams' career records for games played by a quarterback (130), touchdown passes (154), passes attempted (3,313), and wins by a starting quarterback (74).

45.     Plaintiff Gabriel's image and identity continues to have value, including as a visible and active community member.  Plaintiff Gabriel has served as the Chairman for 30 years for the Roman Gabriel / MAC Williams Foundation for charitable activities relating to multiple

sclerosis ("MS") and student scholarships, and is active in honoring military veterans.

Additionally, he ran two minor league baseball teams, the Charlotte Knights and Gastonia

Rangers, for many years, and has been involved in radio broadcasting of the games of the NFL's

Carolina Panthers.

46.     Defendants have used, and will continue to use unless enjoined, Plaintiff

Gabriel's image and identity for promotion without his permission and without compensation.

47.     Plaintiff **Willie Buchanon** is resident of California.  He is a former NFL

professional football player and a member of the proposed Class set forth herein.  Plaintiff

Buchanon played in the NFL as a defensive back for eleven (11) seasons from 1972 – 1982.  He

played in college for San Diego State University, where he was named to the All America team,

was voted the Most Valuable Player in the East-West Shrine Game, and was named by *Sporting*

*News* to its All-Time collegiate team.

48.     In the NFL, he was the seventh overall pick in the 1972 NFL draft, voted

defensive rookie of the year in 1972, was three (3) times selected to play in the Pro Bowl, and

was three (3) times named to the NFL's All-Pro team.  In 1978, he led the NFC with nine (9)

interceptions.  He holds various single-game records for interceptions and fumble recoveries.  In

his career, he totaled 28 interceptions and 15 fumble recoveries.

49.     He was named to the Green Bay Packers All-Time team, elected to the Green Bay

Packers Hall of Fame, and the San Diego Hall of Champions, as well as to the San Diego State

Hall of Fame, and to the California State Junior College Hall of Fame.

50.     Plaintiff Buchanon's image and identity continues to have value, including as a

visible and active community member.  Plaintiff Buchanon established The Buchanon Youth

Foundation which provides funds for youth after-school programs.  It supports all youth

programs at Mance Buchanon Park, a 28 acre park named after Plaintiff Bucahnon's father, in conjunction with the city recreation department.  Plaintiff Buchanon and the Foundation also supports the local high school's under- funded sports programs, and awards an annual scholarship in the name of Mance Buchanon Jr.

51.     Defendants have used, and will continue to use unless enjoined, Plaintiff Buchanon's image and identity for promotion without his permission and without compensation.

52.     Plaintiff **Joseph Robert Kapp** ("Joe Kapp") is a resident of California.  He is a former NFL professional football player and a member of the proposed Class set forth herein. Plaintiff Kapp played in the NFL for four (4) seasons, from 1967 – 1970.  Plaintiff Kapp is the only football player to play quarterback in the Super Bowl, the Rose Bowl, and Canada's Grey Cup.  Plaintiff Kapp played college football for the University of California – Berkeley, and was an All American.  He is a member of the College Football Hall of Fame, the University of California Athletic Hall of Fame, the Canadian Football Hall of Fame, the British Columbia Sports Hall of Fame, and the BC Lions Hall of Fame.  He also was the head football coach for the University of California – Berkeley from 1982 – 1986.

53.     Plaintiff Kapp began his professional football career in Canada, eventually leading his team to win the championship of the Canadian Football League ("CFL"), known as the Grey Cup.  In 1967, Plaintiff Kapp chose to return to the United States in order to play professional football in the NFL.  In 1968, Kapp led the Minnesota Vikings to their first ever playoff appearance.   In a 1969 game, Plaintiff Kapp threw for seven (7) touchdown passes, which still stands as the NFL record shared with four other players, and Plaintiff Kapp was the last player to achieve that number.  After the 1969 season, he led the Vikings to a berth in Super Bowl IV in January, 1970.

54.    In 2009, ESPN.com reported the following:

> Joe Kapp made headlines on and off the field. By standing up to the NFL in an antitrust case, he helped future generations of players earn far more than they made during his career . . . NFL commissioner Pete Rozelle demanded that he sign a standard player contract. Kapp refused based on the recommendations of his lawyer and the NFL Players Association. As a result, his 12-year career as a professional football player ended in 1971. However, his NFL journey continued with the antitrust lawsuit against the league, claiming its standard contract was unconstitutional and a restraint of trade.
>
> In 1974, a federal judge agreed that the NFL had violated antitrust laws, in part because there was no collective bargaining agreement in place on the date in question. The NFL settled with the Players Association in a multimillion-dollar case. The old system died and was replaced, and NFL players were the big winners. While Kapp was not awarded any personal damages, he won the respect of a generation of players.

55.    Kapp broke more ground when returned to Cal-Berkeley, his alma mater, in 1982, becoming the first Latino head coach in NCAA Division I-A football. He was named the Pac-10 Conference Coach of the Year that season, 24 years after he led them to the league championship as a player in 1958.  Additionally, in 1999 Plaintiff Kapp served as the General Manager ("GM") of the Canadian Football League's BC Lions.

56.    Plaintiff Kapp's image and identity continues to have value, including as a visible and active community member.

57.    Defendants have used, and will continue to use unless enjoined, Plaintiff Kapp's image and identity for promotion without his permission and without compensation.

58.    Plaintiff **Michael Thomas Bass** ("Mike Bass") is a resident of Florida.  He is a former NFL professional football player and a member of the proposed Class set forth herein. Plaintiff Bass played in the NFL as a defensive back for eight (8) seasons between 1967 – 1975, and played for the Washington Redskins in all but his first season, which was spent as a member of the Detroit Lions.  He played in Super Bowl VII in 1973 for the Redskins, and scored the

team's only touchdown in that game, in which he memorably recovered a fumble by the Dolphins' kicker Garo Yepremian and returned it 49 yards for a touchdown, a play that continues to be featured by NFL Films in their promotional materials.

59.     Plaintiff Bass played collegiate football at the University of Michigan, where his team won the Rose Bowl in 1965.  In 1971, Plaintiff Bass led the Redskins with eight (8) interceptions, third best in the NFL that year.  In 1974, he was selected to the first team All-NFC team.  In his NFL career, Plaintiff Bass recorded 30 interceptions for 478 return yards.  In 2002, he was selected as one of the 70 Greatest Redskins of All Time.

60.     Plaintiff Bass' image and identity continues to have value, including as a visible and active community member.

61.     Defendants have used, and will continue to use unless enjoined, Plaintiff Bass' image and identity for promotion without his permission and without compensation.

**B.      Defendants**

62.     Defendant NFL Productions LLC d/b/a NFL Films ("NFL Films") is a limited liability company with its principal place of business in this District in New Jersey located at One NFL Plaza, Mt. Laurel, NJ 08054 and organized under the laws of the State of Delaware.  NFL Films was formally organized as "NFL Films Inc." with its headquarters located in this District in New Jersey.  NFL Films has also utilized the name "NFL Films International."  NFL Films is a wholly-owned subsidiary of "NFL Ventures L.P."

63.     Defendant National Football League ("NFL") is a tax-exempt association under 18 U.S.C. § 501(c)(6) with its headquarters located at 280 Park Avenue, New York, NY 10017.  The NFL as a company operates several business wings through which it, in part, carried out the misconduct described herein.  These include, but are not limited to, the NFL itself and doing

business as NFL Properties, both located at 280 Park Avenue, New York, NY 10017; NFL Enterprises, also located at 280 Park Avenue, New York, NY 10017; NFL Films, located at 1 NFL Plaza, Mount Laurel, NJ 08054, and NFL Network, located at 10950 Wash Boulevard, Culver City, CA 90232.  Each of these business divisions operates under the exclusive control of the NFL itself.  The NFL is one of the largest entertainment entities in the world with 2008 revenue totaling an estimated $6.9 billion.

### III.   JURISDICTION AND VENUE

64.     This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331, as this action arises under the federal Lanham Act, 15 U.S.C. § 1525.  Additionally, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and the Plaintiffs and other putative Class Members are citizens of different states than Defendants.

65.     This Court has personal jurisdiction over Plaintiffs because they submit to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants because Defendant NFL Films' principal place of business is located in this District in New Jersey, and Defendant NFL continuously and systematically conducts business in this District.  Furthermore, many of the actions giving rise to this Complaint took place in the District.

66.     Additional reasons why New Jersey is an appropriate venue for this litigation include the following:

- NFL Films' promotional materials using Class Members' images, at issue in this case, are created in New Jersey, emanate from New Jersey, are distributed from New Jersey, and are stored in New Jersey.

- NFL Films executes in New Jersey its contracts providing for the use and licensing of Class Members' images contained in NFL Films' products.

- New Jersey has the most significant and substantial relationship to, and significant and substantial interest in regulating, the acts, occurrences and omissions complained of herein.

- The NFL's 2012 Media Directory lists one of principal places of business for the NFL Network, a prime user of NFL Films' products containing Class Members' images, as being "(New Jersey) One NFL Films Plaza, Mt. Laurel, NJ (08054), 856/222-3500."

- The NFL's 2012 Media Directory lists the following NFL Films executives as being based in NFL Films' New Jersey headquarters: President, Chief Operating Officer and NFL Senior Vice President, Executive in Charge of Production Operations, Executive in Charge of Production Application Development & Support, Senior Executive in Charge of Engineering and Broadcast Technology, Senior Coordinating Producer, Executive in Charge of Audio & Studio Operations, Executive in Charge of Cinematography, Executive in Charge of Project Management, Chief Financial Officer, Senior Director of Media Services, Director of Rights & Licensing, Player & Talent Manager, & Director of Corporation Communications.

- On September 24, 2002, NFL Films issued a press release regarding "its new 200,000 square foot, state-of-the-art film and television studio complex on Tuesday, September 24 at Bishops Gate Corporate Campus in Mt. Laurel, New Jersey – approximately 15 minutes outside of Philadelphia." The press release further stated that "The new complex reinforces [NFL Films' President Steve Sabol's philosophy that NFL Films is one of the last, great Hollywood studios that has all craft areas under one roof. 'What makes us unique is not just the talent we house in this building, but the variety of that talent. Our cinematographers are dispatched from here. The film is processed here. And, the legendary stories of the NFL are shaped here ... until they are told to the fans through television, DVDs and the Internet." The press release continued that "The studios, build on a 26-acre site, ensure that NFL Films maintains its position at the forefront of film and video technology. It was designed to specifically address the extraordinary production needs of NFL Films: nearly 300 craftspeople create more than 400 hours of original NFL programming annually distributed across 30 domestic networks and over 200 countries, the Internet, home videos, DVDs and CD-ROMs."

- NFL Films presently maintains on its website a "'Special Order Order Form" directing that purchasers who wish to purchase NFL Films' products should "Mail Your Order to: NFL Films, Dept. SP, One Sabol Way, Mt. laurel [sic], NJ 08054." NFL Films states on its order form "For questions about your order call 856/638-6843 and leave a message," and "For overseas shipments please leave a message at 856/638-6843." That telephone number is a New Jersey telephone number. NFL Films further states that entities or persons interested in licensing NFL Films' footage can contact its "footage licensing department," titled "NFL Films Footage Licensing" including by telephone at "856-638-6818," a New Jersey phone number.

- On February 5, 2013, on the eve of the Super Bowl played in New Orleans, Louisiana, Louisiana's *The Advocate* reported that NFL Films' "Two semi trucks have arrived from company headquarters in Mount Laurel, N.J., loaded down with all the equipment that makes the magic possible." The article continue that "After the game ends, all the footage boards an overnight plane to New Jersey ..."

- A 2007 article titled "Interview with NFL Films CFO Barry Wolper" stated that "Wolper bankrolled a gigabit Ethernet voice and data backbone that delivers high-speed communications (including voice over IP) between NFL Films headquarters in Mount Laurel [New Jersey] and the NFL Network's Culver City [California] production facility."

- NFL member teams are prime users of NFL Films' content, and by contractual agreement share in the licensing revenues generated by NFL Films.  NFL member team the New York Jets states on its website that they maintain their corporate headquarters and team training, practice facilities, and medical facilities at their "Atlantic Health Jets Training Center" in Florham Park, New Jersey on One Jets Drive in an approximately 224,000 square foot complex set on approximately 27 acres. The facility serves as "the home base for the entire Jets organization." The Jets play their home games at MetLife Stadium, located at One MetLife Stadium Drive, East Rutherford, New Jersey 07073, and have played their home games in New Jersey since the 1984 season. The Jets make use of NFL Films footage on their website.

- NFL member team The New York Giants' headquarters and training facilities are located in New Jersey at the Quest Diagnostics Training Center, located at 1925 Giants Drive, East Rutherford, New Jersey 07073. The Giants also play their home

games at MetLife Stadium in East Rutherford, New Jersey, making it the only stadium home to two NFL teams. The Giants have played in New Jersey since 1976. Giants President John Mara serves in a key position of the NFL's "NFL Network Committee."

- The next Super Bowl is scheduled to be played in New Jersey on February 2, 2014 at MetLife Stadium.

- The NFL's 2012 Media Directory lists its "NFL Alumni" entity as being headquartered in New Jersey at 1 Washington Park, Newark, NJ 07102.

- On August 7, 2012, the NFL initiated litigation in New Jersey by filing a Complaint in federal court against New Jersey Governor Chris Christie and others, "challenging New Jersey's plan to sponsor, operate, advertise, promote, license, and authorize gambling on amateur and professional sports ... " The NFL's Complaint indicates that New Jersey's plan was signed into law by Governor Christie following passage by the New Jersey legislature.

- The NFL specifically put its brand at issue in its New Jersey complaint, stating that "the proliferation of sports gambling threatens to harm the reputation and goodwill of Plaintiffs, and to adversely affect the way the public views amateur and professional sports."

- NFL Commissioner Roger Goodell submitted a declaration in connection with the New Jersey federal case, stating that the NFL "strives to preserve and promote an image of fairness, and has invested mightily in maintaining this image."

- In that New Jersey federal case, NFL Commissioner Roger Goodell testified in his deposition that "What we do in professional sports and I do as Commissioner and the other Commissioners do is make sure that we do everything to protect that brand, to make sure that nobody can damage that brand."

- Commissioner Goodell testified at length about consumer confusion as to endorsement and sponsorship of products, in words equally applicable to the NFL's creation of consumer confusion that former players are endorsing the NFL by their appearances in NFL Films' promotional products. He testified: "People want to associate themselves with the NFL without paying for it and without having any association because that's how they ambush, that's how the get that association . . . If you are allowed to have

sports gambling at any one of your facilities, whether they be casinos or – they will say that the NFL – you can come here and gamble on the NFL. That will appear to the consumer, the average consumer that we are sponsoring that. That is not in our best interest of the National Football League."

When asked "what is your basis for believing that fans do think that State-sponsored sports wagering means that the NFL supports sports wagering?," testified "Again, because you will use that association if it's permissible. If it's the law, you will use that to attract people into your facilities to bet on our games. That will try to drive an association. That's what people do. In the other instance when I was describing the other commercial agreements, that's what they try to do."

Commissioner Goodell then testified: "Let me try to say it another way: A sports network that does not have the NFL will cover the NFL. They'll try to say: We have the best NFL information. They'll draw to draw that distinction as if they have a license to present the NFL. They don't but they'll try to draw that connection. That is something that we protect as best we possibly can."

- The State of New Jersey has been a client of NFL Films in connection with the production of promotional materials.

- In May of 2013, the New Jersey legislature passed a resolution designating October 2nd of each year "Steve Sabol" day in New Jersey, stating among other things that "Under Steve Sabol's direction, NFL Films has also become the definitive historical archive for American football films, with its film vault storing more than 100 million feet of game film," and that "The success NFL Films has had in the sports industry is unparalleled," and that "NFL Films has had its headquarters in New Jersey for decades and is currently located in Mount Laurel, New Jersey."

## IV.   FACTUAL ALLEGATIONS

### A.   The NFL and its Commercial Brand

67.   NFL Films presently states on its website that its first major production included

the narrator stating, with respect to every NFL professional game, that "[i]t starts with a whistle,

and ends with a gun." NFL football, in turn, started with a simple game, and ended as an international television network and a global brand.

68.     The NFL presently states on its website that "we are fortunate to be recognized as one of the world's strongest entertainment brands." (emphasis added).[1]  The NFL also states that it is "the world's leading sports business, media and entertainment company."  The development and expansion of the NFL's commercial brand is extremely important to it.  For example, in February of 2010, Gary Gertzog, the NFL's Senior Vice President Business Affairs – General Counsel, provided written testimony to a federal court in San Francisco, California, and stated that "[t]he NFL promotes its brand through licensing its intellectual property in a number of categories, including, but not limited to, clothing, souvenir merchandise, and other consumer goods."  He further testified that "The availability of a diverse collection of NFL-branded products is an important avenue for the League to connect with consumers, foster interest in the League product, NFL Football, and continue to grow its fan base."

69.     On January 20, 2010, the NFL's Gertzog submitted written testimony to the United States House of Representatives, Committee on the Judiciary, Subcommittee on Courts and Competition Policy, and testified that "[t]he National Football League's mission is to produce a premier entertainment product that appeals to the broadest possible audience.  As part of that effort, we encourage fans and potential fans to identify with the NFL and their favorite team in a variety of ways.  Those efforts include ensuring that fans of all teams have access to a broad variety of high quality, appealing consumer products that bear NFL and team marks and logos.  Those promotional efforts have been successful:  We are America's most popular sport, with over 180 million fans."

---

[1] All emphasis here is added unless otherwise indicated.

70.     Gertzog further testified that "[t]he League controls all aspects of the production of NFL Football.  It determines when and where the games are played, the rules of the game, the playing schedule, and rules relating to how the NFL entertainment product is produced and presented to its fans."

71.     The NFL's Gertzog further testified that "[l]icensing of NFL intellectual property is an integral part of the collective efforts of the League and its member clubs to promote their collective entertainment product, NFL Football.  Products bearing NFL intellectual property, including apparel, are an important expression of the image of the NFL and its brand."

72.     Mr. Gertzog further testified that "NFL Properties also has a separate quality control department that reviews thousands of product submissions to ensure that the NFL intellectual property is used in an appropriate manner on licensed products and to ensure that licensed products reflect the branding goals associated with NFL football."

73.     In 2003, the start of the Class Period alleged herein, NFL Network President Steve Bornstein boasted to *USA Today* that "everybody wants to be associated with the NFL brand."

74.     In May of this year, New Jersey's nj.com reported the following:

> Two months ago, the National Football League announced its newest, and perhaps most intriguing, path to widening its already expansive revenue stream. The league would partner with a prominent private equity company to invest in media projects. Long just a football-only conglomeration, it has moved on to extend its brand into other worlds.
>
> The NFL is the first professional sports league to unveil a venture capital arm. Already a $9.5 billion enterprise, the NFL remains in search of growth. In 2010, commissioner Roger Goodell, according to several reports, expressed a desire to take in $25 billion in revenue by 2027. Reaching that goal means it must do more than just sell its sport.
>
> Brian McCarthy, a league spokesman, said the NFL's continuing evolution was the impetus.

- 25 -

"We are much more than a game on the field," McCarthy said. "As our core business, we always focus on that, but it's a sports and entertainment and media venture that the NFL has spun into. At one point it was just a game, but we've seen the value it has to other businesses. We see the value it has to Madison Avenue. We see the value it has to our media partners. So we're continuing looking for ways to grow our business, expand the footprint of the NFL."

The league will team with Providence Equity Partners in its new undertaking. The NFL will invest $32 million -- $1 million per team. All profits will be doled out equally to teams, like its television rights.

…

Providence Equity Partners, according to a SportsBusiness Journal report, will commit $250 million. Calls to Providence for comment were not returned.  The company and the league will have an equal stake in running the operation.

"The NFL is contributing the shield, which does have a massive amount of value as an intangible," said Rob Tilliss, founder and CEO of Inner Circle Sports, an investment bank that focuses on the sports world. "So you could argue it's pretty equal footing."

Although the NFL announced in a statement that it would focus on investing in "sports- and entertainment-related media assets," McCarthy said the NFL will not limit itself to investing in companies that are solely and/or tangentially related to football.

"No," he said. "It could have some application that could have nothing to do, at the core, with football."

75.     In addition to developing its spectacularly successful national brand, the NFL has

successfully endeavored to develop an international brand.  The NFL's 2012 Media Guide lists

the following NFL international entities:  "NFL Canada," "NFL China," "NFL Japan," "NFL

Mexico," and "NFL United Kingdom."  With respect to the NFL's wholly-owned "NFL

Network," a television network discussed herein in more detail, NFL Films stated to a federal

court in Philadelphia in 2006 that the NFL Network "was launched in November 2003," "has

distribution deals in Canada and Mexico."  In a May 30, 2013 television interview with "Forbes

Sports Money," NFL President Steve Bornstein stated with respect to the NFL Network that "We have 5 million homes in Canada, and we have another I think 5 million homes in Latin America ….We're looking at the UK."   The NFL, in a section of its website titled "NFL International," presently references (in clearly outdated information) its "International Programming" and "[t]he 234 countries and territories receiving NFL programming in the 2005 season."

76.     The NFL presently maintains a website serving Europe, and in particular, the United Kingdom – www.nfluk.com.  It states that "[o]ur site offers a distinctly British take on the NFL, everything you need to know about games on television or the events in the UK, as well as the very best of the sport on the web from the USA."  It further states that "[t]he NFL UK office – based in London – is responsible for managing the NFL's business in the United Kingdom and overseeing the continued development of professional American football. This includes building the NFL's fanbase, creating local broadcast and sponsorship deals and developing important relationships within the sporting, governmental and commercial communities."  The NFL further states that "NFL UK's broadcasting platforms are very impressive. Sky Sports, Channel 4, BBC Sport and BBC Radio combine to provide comprehensive coverage of the sport via digital and terrestrial platforms, while the league's official website – nfluk.com – boasts 370,000 registered members."

77.     In the website's "Videos" section, a voluminous amount of NFL Films' content is posted.  Searching by "Most Viewed" indicates that footage of former NFL players dominates the rankings.  For example, the top 10 include "Jerry Rice," "San Francisco 49ers team history," "Joe Montana," "New England Patriots Team History," and "Miami Dolphins team history." The bottom of the page indicates that all footage is from NFL Productions LLC.  The videos constitute continual reinforcement of NFL branding, featuring repeated and prominent displays

of the NFL shield logo, the NFL Network logo, and numerous NFL team logos. To be clear, these are graphics added by NFL Films, not a part of the original footage. Indeed, for much of the footage, the NFL Network was not even in existence.

78.     As one example, during a less than four (4) minute span of the "Jerry Rice" presentation, a graphic of the NFL shield logo is prominently displayed at least seven (7) times, including whenever individuals commenting on the footage are shown from *Sports Illustrated*, *USA Today*, SiriusXM Radio, Yahoo! Sports, and CBS Sports, and it is larger than the commentator's name and affiliation. Moreover, numerous commentators are interviewed with a very large NFL banner or logo draped in the background. Additionally, graphics of numerous NFL teams are prominently displayed. Moreover, numerous logos of the NFL's corporate sponsors are set below the footage, *i.e.*, for Budweiser, Papa Johns pizza, AON, Virgin Atlantic, VISA, Marriott, and Pepsi. Additionally, a large NFL shield logo appears at all times above the footage viewing window, along with "NFL UK" in large letters.

**B.     The Importance of NFL Films to the NFL's Commercial Brand**

79.     The last decade has featured the accelerated and explosive growth of NFL Films, as well as its participation in entirely unforeseen territory – most notably, the formation of the NFL Network in 2003, and its development up until the present day, as well as with respect to brand new technologies that the NFL utilizes to market, publicize and promote its commercial brand.

80.     The NFL, when required in its federal tax returns to describe its "mission or most significant activities," states that it is a "[t]rade association promoting interests of its 32 member clubs." The NFL further states therein that its "achievements" are "[t]o present the National Football League and its teams at a level that attracts the broadest audience and makes NFL

football the best sports entertainment in the world." Each year, in the "Statement of Functional Expenses," the NFL indicates that it expended *zero dollars* for "Advertising and Promotion." It is a fair question as to how an entity whose very self-described mission is promotion could spend *zero dollars* on promotion and advertising. The answer is NFL Films.

81.     A chronological overview of various items from the past decade is instructive in understanding NFL Films' critical role with respect to promoting the NFL's commercial brand, and NFL Films' past, present, and future. On September 16, 2002, CNN.com and Fortune Magazine reported that NFL Films "generates more than $50 million in revenues today and is growing annually at a double-digit rate" and "that impressive performance doesn't measure its true influence." The article further quoted Art Modell, then owner of the NFL's member team the Baltimore Ravens, as that stating that "[t]he money we make from NFL Films is petty cash" because "[w]e sold the beauty of the game through NFL Films." The article further quoted Ernie Accorsi, General Manger of the NFL's member team the New York Giants, as stating that "[i]n the early 1960s baseball was the No. 1 sport, college football No. 2, and boxing No. 3" and that "Pro football took over the country, and NFL Films had a lot to do with it." The article further stated that each NFL team "receives a gross percentage royalty of NFL Films' revenues each year."[2]

82.     On September 16, 2002, CNN.com and Fortune Magazine reported that despite "media criticism for leaving out the seamier side of pro football, the people at NFL Films embrace their role of magnifying the game. Its corporate video opens with the 1999 *Sports*

---

[2] *See also* Deloitte & Touche Independent Auditor's Report, NFL Ventures, L.P. and Subsidiaries, 2010, at 25 ("Films Royalty – The Partnership is required to remit royalty payments to the Member Clubs, calculated from certain Films LLC revenue sources, as defined in an agreement dated July 1, 1991. During the years ended March 31, 2010 and 2009, management of the Partnership recognized royalty expense of $6,105,225 and $6,086,512, respectively . . .")

*Illustrated* comment, 'NFL Films is perhaps the most effective propaganda organ in this history of corporate America.'"

83.　　On September 24, 2002, NFL Films issued a press release stating that it "officially opened its new 200,000 square foot, state-of-the-art film and television studio complex" located at "Bishops Gate Corporate Campus in Mt. Laurel, New Jersey – approximately 15 minutes outside of Philadelphia.  'This is Hollywood on the Delaware River,' says Steve Sabol, president of NFL Films."

84.　　On December 5, 2002, the *Philadelphia Inquirer* stated that "NFL Films has been one of the main creative forces in promoting professional football from a second-rung fall entertainment to a Sunday religion."

85.　　On May 5, 2003, *SportsBusiness Journal* reported that the NFL Network, "which is scheduled to launch this fall on DirectTV, initially will rely on NFL Films archives, preseason games and a mix of other programming ..."  The article continued that "[f]ew disagree that the NFL Network, regular-season games or not, should help promote football while succeeding financially."  It further stated that "[a] rule of thumb is that the average cable start-up needs to spend about $100 million over a three-to four-year period before reaching the black.  The NFL Network, with its low programming costs, may do it sooner and cheaper."

86.　　On July 2, 2003, the *Oklahoman* reported NFL Films' Vice-President Kennie Smith as stating that "[w]e are like the 33rd team.  We're not reporters.  We're not here to expose anything.  We're here to make these guys look good."

87.　　On July 10, 2003, *The New York Times* reported that, with respect to the NFL Network, "[t]he league is not actually paying the $100 million in startup costs.  Its new five-year, $2 billion satellite deal with DirectTV to carry the 'Sunday Ticket' slate of out-of-market games

includes $20 million a year to finance the NFL Network."  The article continued that "[t]he 9 p.m. 'NFL Films Presents' will be a combination of new and old productions from the league's enormous archives" and that with the exception of two shows, "Nearly all of the rest of the programming will be created by NFL Films, with its archive of 100 million feet of film.  Old network games will not be replayed."  The article quoted NFL Network President Steve Bornstein as stating "With these networks, you want 1,500 hours a year of original programming.  We have 3,000.  That's already two years in the can."  The article continued that "[t]here is no need to shoot more games – [NFL Films' Steve] Sabol sends crews to every one – but to find new uses for what has already been seen on ESPN and HBO Sports and to use the lode of footage that has never been shown – half of its huge library."  The article quoted Mr. Sabol as stating "The great thing is we've had so many ideas that we've never had the chance to do.  Things in a file drawer have had the quietus placed on them for 25 years.  We'll have carte blanche to do what we want to do."

88.     On July 11, 2003, the *Hollywood Reporter* reported that the NFL Network "will rely heavily on its huge NFL Films library with its 3,000 hours of inexpensive programming for much of its on-air material."

89.     NFL Films presently states the following on its website in the "NFL Films History Timeline": "2003 NFL Films is the key contributor to the launch of NFL Network – the first television network fully dedicated to the NFL and the sport of football."  In another document, NFL Films states that in 2003, "NFL Films plays pivotal role in launch of NFL Network."

90.     On November 2, 2003, *SportsBusiness Journal* reported that "[NFL Network President Steve Bornstein] noted that the league also is offering bait to cable operators in the

form of access to the NFL Films library for video-on-demand purposes, high-definition programming and 'association with the NFL brand,' assets he said make the NFL network an attractive proposition for cable companies." The article further quote Mr. Bornstein as stating, with respect to progress on getting cable companies to carry the NFL Network, "It usually comes down to money. But no one can deny that the group we've assembled is first class, and no one can deny that the NFL Films library is an attractive product, and everyone wants to be associated with the NFL and the NFL brand."

91.     On November 2, 2003, *USA Today* reported that "The NFL Network, with some of the same advertisers as seen during NFL game coverage, shouldn't have a problem filling its 168 hours of weekly programming. About two-thirds of it will come from NFL Films, which has 110 million feet of film, including 90 million feet that has never been shown. [NFL Network President Steve] Bornstein, who was president of ESPN when he left in 1999, says, 'My theory of programming is that if you haven't seen it before, then it's fresh.'" The article further quoted Mr. Bornstein as again stating, with respect to cable operators and advertisers, "It usually comes down to money. But everybody wants to be associated with the NFL brand."

92.     On February 1, 2006, NFL Films President Steve Sabol stated in *Inc.* magazine that "[w]e tripled [NFL Films'] workload when the NFL Network debuted in 2003 because we produce 90% of the network's footage, including 10 original shows."

93.     The NFL's business partner IBM assisted NFL Films in developing a "digital content management and distribution system." In 2006, in its "case study" regarding the project, IBM stated that "NFL Films is the league-owned media production company that has long been its main promotional channel." IBM reiterated that NFL Films "is the NFL's most important promotional channel." IBM continued that "[i]t is through such programs that NFL Films

represents the face of the NFL, which is why the quality and richness of the content it produces is so important."

94.     In March 2008, New England Patriots owner Robert Kraft stated to the *Philadelphia Inquirer* that, with respect to NFL Films, "The film library, the asset base that's there, the programming … it's sort of like Beatles music or Beethoven's symphonies or Brahms. When you and I aren't here anymore, people will still love to watch it because of the quality of it and the uniqueness and the appeal.  I think that's pretty special."  The heart of the library is the players' images.

95.     The NFL Network has utilized the marketing slogan "Where Football Season Never Ends," *e.g.*, during a television commercial run during the Super Bowl in January 2009. NFL Films' promotional materials, using Class Members' images, are what allows football season to "never end" and the NFL to generate year-round revenues.

96.     The accounting firm Deloitte & Touche LLP prepared an "Independent Auditors' Report" for "NFL Ventures, L.P. and Subsidiaries" for "the Years Ended March 31, 2010 and 2009."  With respect to NFL Ventures, the parent of NFL Films, it states that NFL Ventures' purpose is "to advertise, promote and market the National Football League ('NFL') and its Member Clubs" and that its "operations are primarily conducted through its wholly-owned subsidiaries."

97.     NFL Films' Manager of Operations Bob Collum presently states this on his internet LinkedIn profile:  "The real value of NFL Films is how it packages and sells the game and many credit it as a key reason that the NFL has become the most watched league in the United States.  NFL Films has made the National Football League the second-most filmed subject, behind World War II."

98.     The NFL presently states this on its website: "NFL Films, created by the NFL more than 40 years ago, is a key supplier of NFL Network's programming. With more than 100 million feet of film in its library, NFL Films is the backbone of NFL Network."

99.     An entity called PSE Promotions presently states on its website that "As the official promotions and partnership agency for NFL Films, we connect league partners with one of the most extensive sports libraries on the planet.  We help sponsors activate with the NFL by creating award-winning custom content that resonates with consumers."

**C.     The NFL's Use of Retired Players' Identities to Earn Revenue**

100.     The NFL's past is a key part of Defendants' present and future marketing and revenue generation efforts.

101.     One of the key ways that the NFL markets itself and its brand is by using its NFL Films division to trade on its past to sell products, enhance its present brand and generate revenue.

102.     The NFL also markets itself by trading on the past of retired NFL players to sell products, enhance its present brand and generate revenue.

103.     NFL Films is the commercial filmmaking wing of the NFL and specializes in creating commercial and promotional films highlighting the NFL's past and featuring retired NFL players as the stars.

104.     According to NFL Films' own website, its explicit "function" is, "To *promote the National Football League* and preserve its history for generations of future fans.  To show the game, the passion and the visceral nature of the game from a player's perspective."  (Emphasis added.)  NFL Films, "launch [ed] pro football into the motion picture business."

105.   *Sports Illustrated* has called NFL Films, "the most effective propaganda organ in the history of corporate America."  As noted herein, NFL Films' boasts about and touts this observation in its internal corporate video.  The *New York Times* has said that NFL Films "has grown for nearly four decades into one of the great movie studios in the country … While Dreamworks or Warner puts out more blockbusters, NFL Films is as innovative as any of them." Filmmaker John Frankenheimer said of NFL Films, "What NFL Films has done for me is to make me emotionally involved with teams I never cared about.  Even if it's a team I never heard of, I can't turn it off."

106.   The NFL Films website further touts the promotional mission of its films:

Unforgettable images.  Raw emotion.  Epic struggles.  Often, these moments only come across on the big screen: part of a screenplay, performed by actors on a Hollywood back lot.  NFL Films creates these same moments without re-takes, scripts or sets … just world-renowned filmmakers fusing the visceral world of pro football and the romance of celluloid.

A super slow-motion sequence of a quarterback launching a spiral through a gray November sky.  A receiver in full stride leaps to make a mid-air catch.  A defender pulls him to the ground and brings the scene to an abrupt end.  The play happens instantly.  The moments last a lifetime.

Stunning cinematography. Exclusive all-access sound. Stirring orchestral music.  Poignant storytelling.  These hallmarks define the NFL Films style … often imitated but never equaled.

NFL Films productions aren't just seen, they're felt.

107.   Of course, the nameless "quarterback," "receiver" and "defender" NFL Films describes as starring in its promotional, revenue-generating films are not nameless.  They are retired NFL Players and Defendants use their names, images, symbols, and likenesses in its films to promote itself, sell products, and make money.

108.    The NFL disseminates the works of its NFL Films division several ways.  By way of example only, the NFL broadcasts NFL Films features on its own NFL Network, and licenses productions to cable television stations such as ESPN, ESPN Classic, HBO, and major non-cable networks.  The NFL also sells NFL Films movies directly to consumers in catalogs, over the Internet, and at retail outlets.

109.    The NFL has realized substantial revenues from NFL Films, including but not limited to fees paid by networks to air the films, revenue from advertisements run during the broadcast of the films, sales of the films as individual products, and from the revenue generated by the realized promotional effect of the films on the NFL's brand and marketability.

110.    Using its NFL Network alone, the NFL broadcasts "hundreds of hours" of NFL Films productions and other programming featuring retired NFL players each year.  As the NFL describes it, "As a year-round channel, NFL Network will draw heavily on the resources of NFL Films and its new 200,000 square foot television and film studio complex as well as its immense film library to produce hundreds of hours of original and class programming including, *NFL Films Presents* and *NFL Films Presents - Game of the Week in HD, Playbook, College Football Sunday, Football America, Point After,* and *Film Session."*  "With more than 100 million feet of film in its library, NFL Films is the backbone of NFL Network."

111.    The NFL also sells hundreds of different NFL Films promotional productions directly to consumers, nationally and internationally, at retail outlets, in catalogs and over the Internet at www.nflfilms.com, www.nflshop.com and sells or has recently sold promotional productions through Warner Home Video at www.profootballdvd.com and other outlets.  In addition to selling NFL Films, the NFL licenses NFL Films and the identities of retired NFL Players for numerous other commercial purposes.

10376-11 629014V1

112.    The NFL Films' website, for example, currently offers or has recently offered hundreds of promotional productions available for purchase for $50 each.  The NFL uses or has recently used the names of specific retired NFL players to promote many of the films for sale. On the "Special Order Catalog" portion of the NFL Films website alone, the NFL uses the specific names of over 450 retired NFL players to promote and sell NFL Films productions.  The NFL uses or has recently used the names, images, and likenesses of these and hundreds of more retired NFL players on the packaging, advertising, and sales descriptions of other NFL Films promotional productions and products available elsewhere.

113.    For example, the NFL sells an entire line of NFL Films productions under the heading "History."  This includes films for sale such as "The Fabulous Fifties, Volume II."  The NFL's sales description for this film states, "Includes Bobby Layne, the 'Alley Oop' pass, Ollie Matson, Dallas Texans/Baltimore Colts."  Other films include, "NFL's Greatest Moments of the Last 25 Years," and "Sensational 60's," for which the sales description reads, "Bucky Pope, Greg Cook, Joe Namath, George Halas, and Don Meredith."

114.    The NFL has disseminated and to this day disseminates NFL Films and other utilizations of the identities of Plaintiffs and Class Members in all fifty states and around the world on multiple television stations, including but not limited to, the NFL Network, ESPN, ESPN Classic, and HBO, and via the Internet.  The NFL has earned substantial revenue from these uses of Plaintiffs' and Class Members' identities and has caused damage to Plaintiffs and Class Members in all of those jurisdictions.

115.    On information and belief, the NFL has sold, and to this day sells, NFL Films' productions and other utilizations of the identities of Plaintiffs and members of the Class to all

fifty states and around the world.  The NFL has therefore caused damage to Plaintiffs and members of the Class in all of those jurisdictions.

116.    The NFL has used the names, images, symbols, and/or likenesses of Plaintiffs and members of the Class commercially on the Internet, to promote the NFL's brand, to sell products, and to otherwise increase the NFL's revenue as an independent entity and on behalf of its thirty-two member clubs.

117.    All Plaintiffs and Class Members whom the NFL has used to generate revenue are readily identifiable because they are portrayed by name, image, uniform, number, likeness, symbol, and/or other unique indicia. In addition, on information and belief, the NFL has digitized its entire NFL Films library and archives so that Plaintiffs and Class Members may be searched for and isolated by year, game, team, and even player name.

**D.    Plaintiffs' Publicity Rights are Extremely Valuable**

118.    The NFL is eminently aware of the extremely high value of the names, images, symbols, and likenesses of its players and takes extreme measures to restrict access and dissemination of NFL player footage and images in any form.  For instance, the NFL restricts media, including local news outlets, to showing only 45 seconds per day of footage of NFL players shot at league or team facilities in any fashion.  This includes *non-playing* situations such as news conferences, interviews and practice-field reports.  If a media outlet shows any footage on its website, the NFL requires the outlet to provide links to both www.nfl.com and to the player's NFL team's website.  The NFL bars nonaffiliated media outlets from selling any Internet advertising connected to the presentation of NFL player footage on non-NFL affiliated websites.

119.     The NFL restriction of player images and footage is not limited to current players. If a media outlet, such as a local news station, wishes to use footage of retired players as part of reporting the news, it must pay the NFL steep fees.

120.     The NFL also prohibits retired NFL players from using their own names, images, likenesses, symbols, and other indicia of identity as players to promote themselves commercially or otherwise profit.  If, for example, a player attempts/attempted to promote himself or his business by showing footage of himself as a player, the NFL would immediately order him to cease.  Of course, the NFL does in certain circumstances allow such promotional uses by retired players, but only if a player pays exorbitant sums for the right to do so.  Even then, the player is at the mercy of the NFL, which maintains the ability to withdraw its permission at any time, for any reason or no reason at all.

121.     The NFL's intent in restricting public access to the names, images and identities of its players is to drive fans and revenue to NFL owned and affiliated outlets to view NFL' images, footage and programming.  As one team spokesman, the Washington Redskins' Chris Helein, informed the Washington Post, "There are a number of reasons for [barring videographers], but it's basically a content issue[.] I won't hide … the fact that the NFL and everything that surrounds it is valuable content."

122.     NFL spokesman Greg Aiello further confirmed the substantial *commercial* value of footage of NFL prayers – wholly apart from any alleged historical or newsworthy value of any broadcast of NFL games.  According to Aiello, the NFL restricts media access to players because:

> We're trying to balance protection of our business assets with the
> equally important need to receive extensive news media coverage
> and communicate with as many fans as possible on a regular basis.

> We have no interest in controlling or limiting what news Web sites
> do, except limiting the use of video that undermines our own
> Internet operations.  We have important business interests on the
> Internet, and we have to be careful about that.

123.   It is in part because of this extremely high value that the NFL created its own

NFL Network in 2003 to drive and capture fans seeking programming related to professional

football.  As the NFL describes it, "NFL Network is a melting pot of gridiron greats from the

NFL's past, present and future that will sate the voracious appetites of millions of football fans

across the country."

124.   Further evidence of the great value of NFL players' likenesses is found in the

standard player contract for NFL players.  Beginning in 1993, the NFL began requiring active

player contracts to include clauses granting the NFL the authority to use the players' names,

images, and likenesses to publicize and promote the NFL.  Of course, any such assignments do

not apply to retired players, as their player contracts are, by definition, no longer in force, and

were expressly for a limited, specified term of years.

125.   By commercializing the names, images, and likenesses of its players, both active

and retired, the NFL has become one of the largest entertainment conglomerates on the planet,

raking in an estimated $6.9 billion in 2008, and estimated revenue of 9.3 billion in 2010.

126.   The NFL did not begin earning billions of dollars in revenue overnight.  It began

earning revenue gradually over many years with the support and sacrifice of the players who

played the game.  Those now-retired NFL players, as a group, suffer severe physical maladies

and disabilities as a result of the sacrifices they made to make the NFL what it is today.  Many

retired players played before the era of multi-million dollar contracts or played only a few

seasons and are struggling financially while the League they helped build reaps record breaking

revenue.  There is thus an *overwhelming* interest in compensating these players for the

commercial use of their names, images and likenesses by the NFL.

**E.    NFL Films Does Not Provide Neutral Reporting**

127.    As is readily apparent from the materials quoted herein, NFL Films does not

provide critical or less-than-positive observations regarding the NFL, its teams, NFL executive

leadership, NFL team owners, NFL players, NFL coaches, or NFL referees.  NFL Films'

products constitute commercial speech, motivated by promotional and economic considerations,

and propose commercial transactions, namely, support of the NFL's brand and purchase of its

myriad of branded goods and services.  NFL Films are advertisements, and feature  and reinforce

the NFL shield logo.  NFL Films constitute "infomercials" for the NFL, focusing on one product,

NFL-branded football, detailing its workings, all in a positive tone.

128.    NFL Films executives have candidly spoken regarding what NFL Films is, and

what it is not.  NFL Films' Steve Sabol was reported as stating "football is the toy department of

life. If we get a little pompous or pretentious or silly or overanalytical, well, the fate of the

universe is not at stake."  He was further reported as stating: "The game is great, but we don't

take everything so seriously.  We're the balloon and the pin.  We blow it up and we can puncture

it."  Steve Sabol was further reported as stating "How many people would go to see *Jaws* if they

knew how it turned out in the end? Well, that's what we're dealing with all the time. The idea is

to give a creative treatment to reality.

129.    NFL Films' former editor-in chief Bob Ryan dismissed television and Internet

highlights as "news" in comparison to NFL Films' "movies."  "The kinds of documentaries we

do are spontaneous cinema, meaning we photograph exactly what happens," he stated. "But then

they're also a creative treatment of reality, meaning that we'll varnish the truth a little bit just to

make it more interesting."

130.    The United States Third Circuit Court of Appeals stated 2008 in *Facenda v.*

*N.F.L. Films, Inc., The National Football League, and N.F.L. Properties LLC* in 2008, "the

video-game's general promotion of NFL-branded football provides an additional indirect

financial motivation."  The same words are applicable here to NFL Films' products.

131.    Any artistic and informational messages conveyed in NFL Films amounts to mere

praise for the NFL, attesting to its realism and popularity.

132.    NFL Films' products are promotional materials, specifically designed to promote

the NFL, its member teams, and the NFL's brand.  Those products do not constitute

newsgathering or news reporting.  NFL Films' products strive to create and reinforce its own

version of its so-called "mythology" and "romance" regarding the NFL, custom designed to

move NFL branded product.  As former NFL coach and sportscaster John Madden once claimed,

"if you're not in NFL Films, you're not a part of NFL history."  NFL Films products glorify and

sensationalize violence.  They function as advertising for the NFL, for the NFL's member teams,

and for the NFL Network.  They served as "branding" for the NFL, and tools by which the NFL

further builds, maintains, and reinforces its "brand," including to reach new generations of fans

in the United States, as well as fans around the world.

133.    NFL Films' products further serve as tools to deflect from the NFL greater

scrutiny regarding a myriad of issues, including safety issues affecting former and current NFL

players, and the NFL's complicity regarding same.

10376-11  629014V1

134.    Even the setting in which NFL Films' productions appear is extremely tightly controlled, and in fact, censored.  For example, on November 23, 2013, the *New York Post* in an article titled "NFL sacks Bradley Cooper segment" reported:

>Bradley Cooper has been banned from the NFL Network in a move Harvey Weinstein's calling "censorship."
>
>The star of the Weinstein Company's "Silver Linings Playbook," with Jennifer Lawrence, was to headline tonight's "Rich Eisen Thanksgiving Special" with co-star Chris Tucker. But after the segment was approved, and taped, the net was abruptly told on Wednesday by NFL Commissioner Roger Goodell's office to scrap it.
>
>The reason? That Robert De Niro's character in the film is a part-time bookie. The decision has left host Eisen and his team scrambling harder than Mark Sanchez to re-edit the show. An NFL Media rep confirmed, "The segment was pulled because the movie included content related to gambling on NFL games."
>
>"This interview was planned for weeks," countered a source. "The network requested the interview."
>
>Until yesterday, the segment was promoted online as the pigskin special's top interview, with a picture of a smiling Cooper, Tucker and Eisen. It was replaced on Thanksgiving by a picture of Eisen and another guest, John Slattery.
>
>Weinstein said, "We are deeply disappointed in the NFL's decision, and we are quite frankly surprised. Pulling a pretaped interview with our stars is nothing short of censorship ... ['Silver Linings'] is not a film about gambling in the NFL. It's a film about fathers and sons and football bonding a family together."
>
>He added that he's a football fan and that his wife, Georgina Chapman, designs clothes for NFL charities and works pro bono.

135.    *USA Today*, in an article titled "NFL censors Bradley Cooper interview over gambling movie," reported that "The hypocrisy of the league on issue like there [sic] is nothing new. Fantasy football, itself a mild form of gambling, is so mainstream that the league's

network runs tickers devoted to fantasy scores.  Yet point spreads are widely discussed

everywhere except during coverage of games."

> 136.    *Sports Illustrated* football analyst *Peter King wrote:*

> I think the league overreacted, and that's putting it mildly, by censoring
> Rich Eisen's interview with Oscar favorite Bradley Cooper and yanking it
> from Eisen's Thanksgiving special on NFL Network. "The segment was
> pulled because the movie included content related to gambling on NFL
> games," the statement from NFL Network said.

> Cooper stars in Silver Linings Playbook, a movie about a bipolar
> Philadelphia Eagles fan who returns home to live with his parents to help
> him handle his mental illness. His father, played by Robert DeNiro, is a
> part-time, small-time bookie. None of Eisen's questions, and none of
> Cooper's answers, concerned gambling on NFL games.

> Three points. First, Eisen's interview with Cooper would have gotten zero
> attention in this column and scant attention elsewhere had it aired, but
> banning it pushed it to the top of the New York Post's infamous Page Six
> gossip column Friday morning and made the NFL look small and
> paranoid.

> Second, Cooper is one of the biggest stars in America. Eisen's podcasts
> and specials get some big stars talking about how much they love the
> NFL. I'm sure Cooper talked about growing up loving the Eagles, and
> building the brand that Eisen is trying to build, of the NFL as a paragon of
> entertainment that people in show business and politics and power all love.
> Now see if Cooper wants to do anything with the NFL again.

> Third, the NFL can't sanitize life. I would bet (oops; bad word choice) that
> a father or two of a prominent NFL player is an inveterate gambler, and
> puts down money on NFL games. I bet NFL players go to Vegas in the
> offseason and put a few bucks down on horses and games. It's America.

> I think, by the way, there isn't a more pro-NFL guy on TV than Eisen, and
> he can do it without seeming like a total house man. That's a great skill to
> have. And what the NFL has done, essentially, is to say to Eisen, who is
> the league's Brian Williams: We don't trust you. If I'm Eisen, I'm furious.

> 137.    *SportsBusiness Daily* reported this:

> Harvey Weinstein, the exec producer of the movie "Silver Linings
> Playbook," discussed the NFL pulling actors Bradley Cooper and

Chris Tucker from an NFL Network podcast because the league deemed the movie to be about gambling.

Weinstein, appearing on Reuters TV, said, "The movie has a theme about football and a little bit about gambling, but it's not about any of those really. It's about family, relationships and romance being given a second chance." He added, "The NFL is saying this movie is about gambling? They better see the movie. I showed the movie to Woody Johnson, who owns the New York Jets. He loved it. And I showed it to (NFL Giants Chair & Exec VP) Steve Tisch and he loved it. We showed it to the Philadelphia Eagles ownership guys and they loved it. So this is ridiculous. I'm pretty sure (Cowboys Owner) Jerry Jones saw it too and he liked it. So I don't get this" (*REUTERS.com, 11/29*).

PRO FOOTBALL TALK's Michael David Smith wrote the NFL "comes across looking silly when it won't even allow an actor to be interviewed on its network if that actor has appeared in a movie in which a character bets on a game." Smith: "This incident makes the NFL look small" (*PROFOOTBALLTALK.com, 11/30*).

**F.    NFL Films' Products Does Not Constitute Protected Art**

138.    In its federal tax returns, signed by Commissioner Roger Goodell, the NFL each year fails to identify any of its holdings as art. Specifically, the NFL each year leaves blank the section of its I.R.S. Form 990 the section titled "Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets." The NFL specifically declines to identify any items as "art, historical treasures, or other similar assets held for public exhibition, education or research in furtherance of public service." The NFL specifically declines to "check any of the following that are a significant use of its collection items" – "Public exhibition," "Scholarly research," "Preservation for future generations," or "Loan or exchange programs."

**G.    NFL Films' Products and Revenue Streams**

139.    NFL Films has numerous distribution outlets for its promotional materials. For example, on October 17, 2011, NFL Films issued a press release stating:

NFL Films, the most honored filmmaker in sports, has selected Vivendi Entertainment (VE) as the exclusive distributor for NFL Films home entertainment programming in the US and Canada. The agreement marks a significant expansion by NFL Films as this is the first time that the company has granted both digital and physical (DVD/Blu-ray) rights for its home entertainment business. The announcement was made today by Barry Wolper, Chief Financial Officer, NFL Films, and Tom O'Malley, President of VE.

As part of the multi-year agreement, VE will now assume the exclusive US and Canadian marketing and distribution of NFL titles, leveraging their highly-anticipated programming across multiple physical and digital platforms. The release schedule will include at least 7-10 new DVD releases each year, the first of which features last year's Super Bowl winners in "Green Bay Packers: Road to Super Bowl XLV (4 Disc Set)."

VE will also distribute the existing NFL Films DVD catalog, which features more than 115 dynamic titles including such fan-favorite collections as the Super Bowls, team histories, the Emmy Award-winning America's Game: The Super Bowl Champions and Complete Game Sets, which show historically beloved games in their entirety.

"The NFL brand stands for innovative, high-quality entertainment production," stated Yolanda Macias, Executive Vice President of Acquisitions & Business Development, VE. "And through our extensive distribution network, we are able to offer compelling programming choices to NFL fans - everywhere and however they want to enjoy the content."

"We are proud to begin a new partnership with Vivendi that will make more of NFL Films' videos available to our fans in more places," Wolper said.

As part of the exclusive distribution agreement, consumers will be able to find NFL Films DVD titles at retail outlets across the country. Online, NFL Films product can be purchased through iTunes, Best Buy Cinema Now and Vudu.

140.    NFL Films' Manager of Operations Bob Collum presently states this on his

LinkedIn profile: "NFL Films produces shows for the NFL Network, ESPN, NBC, CBS, FOX,

Showtime, HBO, and Warner Brothers DVD."

141.     There are dozens of "NFL Films Presents" programs made available by NFL Films on the internet website hulu.com.  Those programs now link to NFL.com, and a visitor receives the message "This video is available at nfl.com.  Selecting this video will now open a new browser window – you will leave hulu.com and go to nfl.com."

142.     On NFL Films' internet website, dozens of DVDs and digital downloads are offered for sale, directing purchasers to click to purchase either through the "NFL Shop" or Apple's iTunes.  On Apple's iTunes, NFL Films products are available to buy or rent at various price points.

143.     Moreover, NFL Films provides to NFL member teams content from NFL Films for use on team websites, such as www.newyorkjets.com and www.giants.com,

144.     NFL teams maintains separate merchandise sales websites through which they offer various products including NFL Films products.

145.     NFL Films' products additional are for sale on the NFL's internet website www.NFLShop.com.

146.     The NFL Network has struck numerous distribution agreements with cable carriers just in recent years.  For example, on May 19, 2009, the NFL and Comcast Corporation issued a press release stating that "they have reached a new, long-term agreement regarding carriage of NFL Network . . . Comcast's Digital Classic customers will now have access to a robust suite of NFL content On Demand, including  game highlights, game replays, the "best' of NFL Films . . . and other NFL programming whenever they want a piece of the action . . . 'We are very pleased that NFL Network and other NFL content will be widely distributed in millions of more homes on Comcast's service,' said National Football League Commissioner Roger Goodell."

10376-11 629014V1

147.    The auditor's report for 2010 for NFL Ventures L.P. and NFL Films states that NFL Ventures "grants affiliates [meaning cable and satellite companies] rights to receive and distribute the NFL Network which carriers programming for eight regular season games, a combination of live shows and entertainment programming as well as content from the Films LLC programming library."

148.    On August 16, 2012, the NFL Network issued a press release with Cablevision System Corporation, announcing that "NFL Network and Cablevision (NYSE:CVC), the largest provider in the nation's top media market, announced today that they have reached a multi-year agreement for carriage of NFL Network and the NFL RedZone channel.  NFL Network will make its debut in Cablevision homes beginning Friday."  The release quoted "NFL Media COO Brian Rolapp" as stating "Cablevision subscribers will be able to enjoy our expanded 13-game Thursday Night Football schedule, Sunday NFL GameDay shows, NFL Total Access, Emmy award-winning NFL Films programming and much more."

149.    On September 21, 2012, NFL Network announced that it "reached multiyear agreements with Time Warner Cable and Bright House Networks, the country's respective second – and sixth – largest cable providers, for carriage for NFL Network and the NFL RedZone Channel."   NFL Network President Steve Bornstein stated that subscribers will be able to enjoy various shows and "NFL Films programming and much more."  The release stated that Time Warner Cable and Bright House Networks are "major cable providers in the home markets for 12 NFL teams" across the country including the New York Giants and New York Jets.

150.    In May of this year, The NFL Network stated in a press release:  "Currently in more than 72 million homes, NFL Network has carriage agreements with each of the country's

- 48 -

largest television providers including Comcast, DirecTV, DISH Network, Cablevision, Cox,

Charter, Time Warner Cable, Verizon FiOS and AT&T U-Verse."

151.   The NFL's continued expansion, modeling of ESPN's business plan, and rapid

adoption of new technologies to further exploit Class Members' rights demonstrate the need for

injunctive and declaratory relief address Class members' future rights and to stop future

exploitation of those rights by NFL Films.

**H.     Examples of NFL Films' Unfair Competition**

152.   NFL Films and Class Members are direct competitors regarding the ability to

control Class Members' images for commercial gain in promotional and advertising products,

and to determine whether or not to use them for commercial gain in promotional and advertising

products.  NFL Films has obtained that ability purely by dint of its unfair and unlawful actions.

Class Members have obtained that ability because it is their inherent right to control and benefit

from the commercial exploitation of their images in promotional and advertising products.

153.   NFL Films is the dominant user and marketer of Class Members' images,

primarily through its arrangements with affiliated entities like the NFL Network.  NFL Films is

thus both a violator of Class Members' interests, as well as the dominant outlet for the

commercial exploitation of those interests.  NFL Films' actions thus directly, and severely,

impact and impair Class Members' interests including marketability.

154.   NFL Films presently states on its internet website, in a section titled "Footage

Licensing," the following:  "Please fill out the information below regarding your footage

requests."  NFL Films goes on to ask for responses to a myriad of questions regarding the desired

use of footage, many of which are detailed below in a section regarding the ease with which

damages in this case, including individual damages, can be computed.  Of note here, the NFL

asks "Are you a former/current player?  How will the footage be used?  If it is for personal use, a player request form will be forwarded to you."

155.    NFL Films further states "PLEASE NOTE:  NFL Films, on behalf of the NFL, is the exclusive holder of all rights, including copyright rights, in and to all NFL footage, regardless of the source of such footage (this includes, but is not limited to, television coverage of games/events, footage shot on NFL sidelines with proper credentials, and NFL Films' coverage). NFL copyrighted footage includes: (1) all footage of NFL game action, including footage of ancillary activities inside the stadium (e.g., cheerleaders, pre-game activities, crowd, sidelines, etc.) from the period three hours prior to kickoff of an NFL game to one hour after the NFL game has ended, and (2) NFL controlled events (i.e., Combine, NFL Draft, etc.)."

156.    The NFL thus publicly misrepresents the breadth of its rights, implying that they extend to controlling the rights or former players regarding commercial use of their images in the NFL's promotional materials.

157.    The NFL in fact recognizes that players depicted in footage have separate rights. The NFL just does not honor those rights.  For example, on NFL.com's "Terms and Conditions," it states at the bottom that "NFL footage © NFL Productions LLC."  In the Term and Conditions, it states that "This following Web site Terms and Conditions Agreement (the "Agreement") governs your use of this Web site (the "Site"), and the various offerings on the Site, which include, without limitation, the various subscription, authentication and mobile products offered by the NFL (collectively, the "Products", and together with the Site, the "Services")."  It further states that "Your use of the Services constitutes your acceptance of the Agreement. Your acceptance of the Agreement provides you with a limited and temporary license and permission

to use the software and other resources of the Services, which license and permission we may revoke at any time, as described below."

158.   The Terms and Conditions further state that "We may provide certain content, which includes . . . video, photographs . . . or other material that is capable of being incorporated, including as a module or via an RSS feed or similar technology, into a web site or other online, cable, wireless, or other service . . . By using Modular Content or incorporating it within or associating it with a web site or other online, cable, wireless, or other service other than the Services, you agree not to: (1) obscure the Operator's branding of the Modular Content, assert or imply ownership or authorship of the Modular Content, or facilitate another party's assertion or implication of ownership or authorship of the Modular Content; . . . or (3) publish, place, or utilize the Modular Content in a setting or manner in which it may be associated with content or other material that  . . . (iii) violates, plagiarizes or infringes the rights of third parties including, without limitation, copyright, trademark, patent, rights of privacy or publicity, or any other proprietary right; . . . (vii) contains advertising, promotions or commercial solicitations of any kind."

159.   The NFL uses similar language on its NFLUK website.

160.   NFL Films' continued use of former players' images is unauthorized, and not consented to.  It expropriates for itself and usurps commercial opportunities that would otherwise flow to and belong to the former players.  NFL Films interferes with former players' commercial opportunities, diverting those opportunities and resulting proceeds to itself and its preferred business partners, at no cost.  It gains substantial competitive advantages over Class Members.

161.   NFL Films has never investigated the scope of any consent by speaking with Plaintiffs or Class Members, and has never asked Plaintiffs or Class Members if they consent to

NFL Films' continued use of their images to market the NFL's brand, and never obtained authorization.

162.    NFL Films repeatedly made conscious, deliberate choices to republish and expand the use of Plaintiffs' and Class Members' images, despite not having authorization to do so.

163.    Further compounding the dynamics of unfair competition, a significant portion of Class members are of advanced years, and a significant portion of Class members have suffered cognitive and other severe and disabling mental and physical injuries due to their participation in professional football.  In many instances players are of very limited means and in some instances impoverished.

164.    Former players have an inability to monitor the explosion of ways in which the NFL is benefiting from the commercial use of their images, including internationally, and including via new technologies.

165.    NFL Films has acted unfairly to misappropriate commercial benefit from the use of Class Members' images, and NFL Films' actions constitute a direct, unlawful taking of Class Members' images for commercial gain.

166.    Moreover, NFL Films has developed the misimpression that Class Members support and endorse the NFL, including through the NFL's current scandal regarding its covering up safety issues relating to concussions.  NFL Films explicitly misleads the public by, e.g., intermixing interviews of current and former players, occurring sometimes at widely varying times, in its editing and splicing of filmed content to create the false impression of endorsement. Additionally, written materials accompanying NFL Films' products further evidence and demonstrate NFL Films' efforts to explicitly mislead consumers about Class Members' endorsement of NFL Films' products and the NFL.  For example, a 2005 NFL Films' product,

10376-11 629014V1

titled "Pro Football Hall of Fame – 85 Years of Greatness," comes with packaging materials

stating "In this landmark 3-disc set, discover the players, coaches and owners as they share first-

hand accounts of the most glorious moments in the game." It further states "From the first Class

in 1963 to the Class of 2005, get an insider's view of the larger-than-life personalities, behind-

the-scenes drama, and epic plays that earned these men their hallowed introductions."

167.    As another example, NFL Films presently has available for purchase or rental, via

iTunes, its production titled "NFL:  Two Minutes to Glory," bearing a 2011 copyright date,

which includes a "Plot Summary" stating "See how some of the 'masters' of the two minute

drill, like John Elway or Peyton Manning, brought their team back to victory.  In-depth

interviews from players and coaches bring you insight on how these miraculous moments were

made possible." Another item that NFL Films makes available for purchase through iTunes is

"The Complete History of the New York Giants," bearing a 2012 copyright date, and its "Plot

Summary" states  "With interviews from Giants' greats such as Frank Gifford, Bill Parcells, and

Phil Simms, the NFL's History of the New York Giants is a must-have for any football fan."

Another production available for sale via iTunes is NFL Films' "The Complete History of the

Philadelphia Eagles," with a copyright date of 2004, with a "Plot Summary" stating "All the

action is recounted by some of the greatest players and coaches in Eagles history from Steve Van

Buren, to Randall Cunningham, to current head coach Andy Reid."

168.    As another example, NFL Films markets its DVDs through the internet website

NFLShop.com operated by the NFL.  At least 67 DVDs are presently for sale there, utilizing

Class Members' images, and at the bottom of the page an official National Football League

Players' Association ("NFLPA") logo is set forth.  The NFLPA is the players' union

representing the interests of *current* players, nor former players.  Notably, the NFLPA's

Executive Director until 2008 was Gene Upshaw, who was reported as stating with respect to former players that "The bottom line is I don't work for them. They don't hire me and they can't fire me. They can complain about me all day long. They can have their opinion. But the active players have the vote."

169.    NFL Films does not use any disclaimer indicating that it does not own the publicity rights of Class Members, or that they do not endorse NFL Films' products.

170.    NFL Films has acted in bad faith towards Class Members.  It has deceived Class Members, consumers, and business partners.  It has created confusion as to Class Members' endorsement of NFL Films' promotional materials.

171.    NFL Films have unfairly compelled Class Members to place the control of the goodwill attached to their entertainment services as professional athletes in the hands of NFL Films, *forever*.

172.    NFL Films has linked and tied Plaintiffs and Class Members forever to the NFL's efforts to commercially promote itself, its brand, and its products.

173.    NFL Films' conduct is unreasonable, unprivileged, and not protected by any immunity or otherwise excused by law.

174.    NFL Films failed to obtain individual or group releases from former players that would cover the NFL's continued, ongoing use of them as promotional tools for the NFL.

175.    NFL Films misrepresents to its business partners that NFL Films has obtained all necessary rights including Plaintiffs' and class members, and continues to enter into contracts in which it makes such representations.

176.    Plaintiff and Class Members been entirely disabled from participating in the gains from NFL Films' continued, collective exploitation of former NFL players.

177.    Numerous entities exist which could facilitate the licensing of former NFL players' rights on a group and/or individual basis.  The NFL has not sought any of them out.

178.    Plaintiff seeks to bar conduct that is improper and works to the disadvantage of Class Members and the public.  As the NFL recently wrote to a federal court in New Jersey in 2012, "Amateur and professional sports are an integral part of American culture, particularly among the country's youth who often look up to athletes as role models."  NFL Films' use of players falsely suggests that Plaintiff and Class Members endorse NFL Films' products and the NFL, including in recent years in which the NFL's conduct in dealing with safety issues impacting its current and former players has been called into serious question.

179.    NFL Films creates the false impression that Class Members endorse the NFL. Were the truth to be known, members of the public would be more informed regarding their purchasing and viewing decisions, and some may make different choices based on having complete information.

180.    Plaintiffs and Class Members have an interest in preventing dishonest competition.  The harm suffered by Plaintiffs and Class Members is an obvious and intended side effect of NFL Film's conduct.

181.    The depictions of Plaintiff and Class Members are the very sum and substance of NFL Films' products.  Without them, there is nothing, an empty field.  The NFL Films products convey literal images of Plaintiffs and Class Members.  Class members are identified by a combination of visual images of them, uniform numbers, and announcers identifying various players as well as the teams and years in which the games took place.

182.    The images of Plaintiffs and Class Members cannot be manipulated by users. They remain at all times the literal, immutable images of Plaintiff and Class Members playing

- 55 -

football, engaged in football-related activities, or being displayed expressly because of their status as professional football players.  They are exact depictions of Plaintiff and Class Members doing exactly what they did as professional football players.

183.    NFL Films' designs, targets and tailors its products for sports fans, i.e., fans of the NFL.  NFL Films designs it products to capitalize on the fan base.  NFL Films feature realism in terms of images.  The images of players are literally the real images of them.

184.    The depiction of player likeness is central to the core of the experience of watching the footage.  Other added features of NFL Films' products, such as music, do not alter or transform Plaintiff and Class Members' identities in any way, let alone in any significant way.

185.    NFL Films was involved in litigation in 2006 in Philadelphia federal court.  It was sued by the estate of an NFL Films narrator for utilizing his voice in connection with a 20 minute infomercial shown on the NFL Network for an NFL-themed video-game.  The trial court's opinion references NFL's use of its "Standard Release," stating that "In consideration of [blank for dollar amount], I hereby grant to NFL Films, Inc. the unequivocal rights to use the audio and visual film sequences recorded of me, or any part of them, in perpetuity and by whatever media or manner NFL Films, Inc., sees fit, provided however, such use does not constitute an endorsement of any product of service."  NFL has not attempted to utilize and similar release form for Plaintiffs and Class Members, despite it having the documented capability of doing so.  The trial court, in finding NFL Films liable, stated that the promotional material "lacks the journalistic independence typical of the maker of a documentary."  It continued that in the material, "no one ... had a negative thing to say about the game.  By contrast, many of the newspaper and magazine articles provided by NFL reported unfavorable points of new, along with the glowing reviews."  The court continued that "I conclude, therefore, that The Making of

Madden was commercial in nature, rather than documentary or journalistic. John Facenda's vocal 'appearance' on the tape would therefore constitute an endorsement of the Madden NFL 06 game. Since the Blanket Release does not give NFL the right to use Facenda's tapes for product endorsement, it is not a defense to this action." Those words are applicable here.

186.     The court further stated that an NFL Films executive was shown in deposition an email in which he used the word "promotes" in connection with the purposes of the infomercial at issue. The court stated that "At his deposition, [his] attempts to explain this e-mail was not particularly lucid." The court further stated that "Despite certain NFL parties' claims to the contrary in their depositions, it is fairly clear that NFL intended to benefit from the association in viewers' minds between Facenda, and authentic NFL football."

187.     The Third Circuit Court of Appeals upheld a liability finding against NFL Films.

188.     NFL Films, however, was unchastened by its rebuke from a federal trial court and a federal appellate court.   With respect to Plaintiffs and Class Members, it continued on in its course of unfair competition.

189.     Moreover, in recent class action litigation in federal court in San Francisco, there is in the public record a redacted copy of the NFL's license agreement with Electronic Arts relating to Electronic Art's NFL-themed football videogames. The license agreement expressly states that "EA is solely responsible for securing all licenses, intellectual property, or other rights to develop, manufacture, distribute and sell the Licensed Products including without limitation group player rights from Players Inc. for player names, likenesses, portraits, pictures, photographs, voices, signatures, facsimile signatures, and biographical information." But with respects to NFL Films' products, NFL Films has never made such efforts to obtain "group player rights," or any rights relating to Class Members.

## I.     The NFL's Likely Defenses are Inapplicable

190.    NFL Films does not enjoy First Amendment protection for its conduct.  As discussed above, NFL Films' products admittedly do not constitute news reporting.  NFL Films admits that its products are promotional products.  As such, it does not enjoy any First Amendment protection.

191.    No defense of "laches" is applicable here, on an individual or class basis.  First, Plaintiff and Class Members have never provided assurances to NFL Films or any NFL-related entity, whether express or implied, that Plaintiff and class members would never assert their rights against NFL Films.  Indeed, NFL Films' use of former players' images has radically changed in just the last decade, morphing into, as NFL Films puts it, the "backbone" of the NFL Network.  No one could have provided assurances about something that would have seemed fantastical for many years.  Moreover, technologies such the ones driving Apple Inc.'s iTunes and NFL Films video content on NFL.com and Hulu.com could have never been imagined even as little as a decade ago.

192.    Second, the maintenance of a laches defense requires a showing of prejudice to NFL Films.  NFL Films has not been prejudiced by any alleged delay in Plaintiffs' and Class Members asserting their rights.  NFL Films clearly would have not refrained from whatever expenditures it has made, and clearly would simply have reached some form of equitable agreement on compensation or royalties just as it does with the other talent associated with its productions, such as former narrator John Facenda, as detailed in the litigation in federal court in Philadelphia captioned *Facenda v. NFL Films.*

10376-11  629014V1

## V.    CLASS ACTION ALLEGATIONS

**A.    NFL Films' Massive Amount of Footage**

193.    NFL Films has used all Plaintiffs and Class Members' images and/or potentially will in the future, meriting wide-ranging relief including injunctive relief.

194.    NFL Films presently states this on its website in an apparently outdated slide: "Q: How many games has NFL Films filmed since 1962? A: At the conclusion of the 2000 season, NFL Films had filmed 7,725 games." On September 16, 2002, CNN.com and Fortune Magazine reported that NFL Films President "Steve Sabol can cite only two crucial shots that NFL Films doesn't have in 37 years of filming every game." The article further noted NFL Films' role in creating "team-highlight films."

195.    NFL Films presently states this on its website in an apparently outdated slide using data from 2005-2006: "Total Games Filmed Since 1962: 9,045" and "16mm film shot per season: 1,000 miles" and "Annual Programming: 1,100 hours."

196.    NFL Films presently states this on its website: "As the world's largest sports film library, the NFL Films archive contains more than 100 million feet of unforgettable football moments – from 1894 to Super Bowl XXXVII. NFL Films is the sole repository and licensor for the NFL's film and network footage."

197.    NFL Films presently states this on its website: "Total Games Filmed Since 1962: 9,312," "16mm film shot season: 1000 miles, the distance from Mt. Laurel, NJ to Orlando, FL," "Annual programming: 600 hours of new original football programming," "over 100 Million feet of football action stored in over 50,000 cans," "Every Championship game since 1933, highlights of every game since 1949," "AFL game footage from 1960-69."

10376-11 629014V1

198.    NFL Films moreover makes representations common to all Class Members.  For example, NFL Films presently states this on its website in a section titled "Footage Licensing": "PLEASE NOTE: NFL Films, on behalf of the NFL, is the exclusive holder of all rights, including copyright rights, in and to all NFL footage, regardless of the source of such footage (this includes, but is not limited to, television coverage of games/events, footage shot on NFL sidelines with proper credentials, and NFL Films' coverage). NFL copyrighted footage includes: (1) all footage of NFL game action, including footage of ancillary activities inside the stadium (e.g., cheerleaders, pre-game activities, crowd, sidelines, etc.) from the period three hours prior to kickoff of an NFL game to one hour after the NFL game has ended, and (2) NFL controlled events (i.e., Combine, NFL Draft, etc.)."

**B.    NFL Films' Cutting-Edge System for Identifying Players in NFL Films' Footage**

199.    NFL Films can readily locate Class Members in its footage in an accurate and systematic way.  NFL Films, in a document titled "50 Years of Pioneer Filmmaking," states on a timeline that in 1987 "NFL Films designs software for digital-footage logging system."

200.    In article dated December 5, 2002, the *Philadelphia Inquirer* reported that within hours of the conclusion of a game, footage from NFL Films cameramen arrives at its headquarters and "As they come in, the films are processed and transferred to high-definition digital tapes that are entered in the NFL Films computer system."  The article continued that an NFL Films employee "sits with about two dozen 'loggers' – most of them young men – in a vast room with comfortable chairs and computer screen covering long desks.  The loggers code every scene in every game film.  Each player, coach, referee and advertising sign on the screen gets a code.  It is an arduous but necessary progress.  Going through the film from every camera from every game will take them all day Monday."

201.     On September 16, 2002, CNN.com and Fortune Magazine reported that at NFL Films "projects like cataloguing every shot in every roll of film according to 140 criteria get done over initial resistance because they help producers like Steve [Sabol] make their films faster and better."

202.     In January of 2004, Videomaker.com reported the following regarding NFL Films: "Obviously, cataloging all those miles of footage is quite a challenge. In the past, the producers at NFL Films relied on the memories of long-time employees jokingly called "'vault savants.'" Concurrent with their move to a new building, however, they've begun to catalog each shot in a computerized database. When footage is processed after each NFL game, it's cataloged with about 150 search parameters, including everything from the styles of uniforms worn to the weather, down to which advertisers' products or ads were visible in the background of a shot. Steve Andrich, NFL Films' vice president of cinematography, says the database allows producers to put in criteria that will bring up a selection of shots, and then narrow down the criteria. "You can say, 'give me Walter Payton's 100 touchdowns' if you put that in as a criterion, it will give you 100 touchdowns. Then 'give them to me at night', 'give them to me ten yards or longer'."

203.     In 2006, the NFL's business partner IBM prepared a "case study" titled "NFL tackles digital content challenges to build a foundation for growth and diversification." IBM wrote that "The NFL engaged IBM to build a digital content management and distribution system that streamlined the way NFL Films ingests, stores, accesses and distributes its content." IBM listed the NFL's "key benefits" as being "Improved ability to leverage and monetize the underlying value of NFL content" and "Improved ability to support new programming outlets, such as shows on the NFL Network." IBM continued that in NFL Films' system, "At the front

end of the process, for instance, videotape is now ingested, digitized and indexed with metadata at the outset, thus eliminating the endemic need to repeatedly copy tapes.  With rich metadata appended to its digital game footage, production staff looking for footage can apply sophisticated queries to quickly locate game situations of interest."  IBM continued that "Making it all possible is a centralized digital media management and distribution solution the NFL calls Digital Foundation."  IBM further provided technical details on the hardware that NFL Films utilizes in its digital content management system.

204.     On August 2, 2007, *Sports Video Group* detailed an interview with Dave Franza, NFL Films' Chief Information Officer, in which he stated that "Our System is designed to internally digitize and index all our game footage," and that the Saber System allows NFL Films to have up to 152 different levels of cataloging.  He continued that "You can search the type of camera used, the weather during the game, or search if a player had blood on [his] pants.  We literally log ever[y] scene and every play."

205.     NFL Films presently states on its website numerous details regarding its computing capabilities, such as the following:  interns in the "Producers Department" function on "locating footage through our video library systems and digitizing tapes in Avid software," "The intern working on Total Access assists in many aspects of feature producing.  Tasks include footage searches, utilizing the our [sic] in-house database system called SABER and the extensive archives of NFL Films," "if a major sports network were to request of all Brett Favre's touchdown passes in the last two years, for use in a new story, interns would then first utilize the NFL Films 'SABER' search system to find the best shots, and then the NFL Films 'POGA' Library Catalog system to located the tape master in our Video Vault," "Media Services is also in-charge of building and maintaining our 'SABER' search system throughout the football

season.  This system catalogues every NFL play and is used throughout the building by NFL

Films Producers, in order to locate shots to be used in NFL Films programming."

206.    On LinkedIn, a profile is presently posted by a "SABER Database Coordinator at

NFL Films."  He notes that in July 2005, "I became our database's coordinator ...  I work closely

with our database's creator and help innovate new ways to search and update the system.  The

SABER database is heavily relied on by producers searching for footage to create their film

pieces.  SABER also assists our research department provide shots for clients including HBO,

Showtime, ESPN and other major networks."  He further states that he's been the "SABER

Archive Database Coordinator" for NFL Films from "August 2005 – Present (8 years)" in

"Mount Laurel, NJ" and "Hires, trains and supervises co-workers in all aspects of database

management and film maintenance" and "Provides major networks and companies with requests

NFL footage," and "Collaborates with information technologies department towards database

sufficiency."  He further states that from August 2002 – July 2005, he worked for NFL Films in

Mount Laurel, New Jersey as a "SABER Database Logger," and "Logged NFL football

highlights into league database for archival production purposes," "Digitized logged highlights in

preparation for producers' viewing and research," and "Compiled specific footage highlights at

the request of ESPN, HBO and other networks."

207.    NFL Films' Manager of Operations Bob Collum presently states on his LinkedIn

profile that, prior to serving as NFL Films' Manager of Operations from January 2000 to Present,

he served as an "Assistant Editor" for NFL Films from August 1987 – July 1991, and at that time

had "comprehensive knowledge of post-production editing, NTSC standards, SMPTE time code,

duplication and archiving ... "

208.    Last month, on July 16, 2013, *Sports Video Group* reported on its annual Sports Asset Management Forum, and the remarks there by Dave Franza, the "VP/executive in charge of production application development & support" for both NFL Films and NFL Network.  The article noted that "SABER would evolve significantly throughout its phase-one development (1996-2000) and then further during phase two (2000-12), serving both NFL Films and NFL Network."  The article noted that "Now Franza and his team are looking to the future, toward integrating SABER with Avid Interplay for all off-line edits, with online HD ProRes for broadcast-quality video . . . and with the NFL Films new Content Licensing Management System.  In addition, NFL Films has made further support for smartphone and tablet apps a priority."  The article continued that "SABER has evolved and now, with the NFL Network on the West Coast, the goal is to have any producer anywhere be able to go on any computer or tablet – remotely or in the office – and find any desired shots, directly edit them, and create a show."

C.    **NFL Films' Detailed Licensing Criteria**

209.    NFL Films *already* has identified a large number of metrics by which to evaluate and identify damages in this case.  It simply does not apply them to itself, only to others.  They can readily be adapted for use here.  For example, in a section on its website tiled "Footage Licensing," NFL Films asks potential licensors to answer numerous items such as these:

> Please provide the exact usage, including description of video, how many times will it be shown, where will it be shown, approximately how many people will be in attendance, will any copies be made, if yes, how many and for what purpose, are you requesting an extended licensing period (e.g., six months, one year, etc.), website use, etc.?
>
> NFL Footage (on-screen time) you plan to include in commercial:
>
> Territory (local, regional, national):

Where will spot be seen (TV, Internet, etc.):

License period required (# of weeks/months spot will air) & commencement date:

Please provide description of program, where will it air, station/network it will air on, when will it air, how much footage do you plan to use, etc.

Please provide detailed description, how much NFL footage will be used, where will it be sold, price point, projected sales, how will it be marketed, etc.

**D.      Specific Class Action Allegations**

210.    Plaintiffs sue on their own and on behalf of a class of persons pursuant to Federal

Rule of Civil Procedure 23.  The Class is defined as:

> All former National Football League ("NFL") professional football players, or their heirs or assigns, that have formally opted-out of the putative class action litigation captioned *Dryer v. National Football League*, Case No. 09-CV-2182 PAM, United States District Court for the District of Minnesota.

Plaintiffs seek a nationwide class applying New Jersey law, given NFL Films' location in New

Jersey, and extensive conduct of business, as well as unfair competition, in New Jersey.

Moreover, as detailed herein, the NFL Network maintains one of its three locations in New

Jersey, and there are numerous other relevant connections with New Jersey such that it would not

be unfair to apply New Jersey law to Defendant's conduct.

211.    Excluded from this class are Defendants, their employees, officers, directors, legal

representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated

companies, class counsel and their employees, and the judicial officers, and associated court

staff.

212.    The persons in the Class are so numerous that individual joinder of all members is

impracticable under the circumstances of this case. Although the precise number of such persons

is unknown, the exact size of the Class is easily ascertainable, as each Class Member can be identified by using Defendants' records. Plaintiffs are informed and believe that there are at least many hundreds of Class Members.

213. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a. Whether Defendants use former NFL players' images and identities in their commercial products;

b. Whether Defendants produce advertisements and other promotional materials using former NFL players' images and identities;

c. Whether Defendants obtained valid consent and authorization for the use of NFL former players' images and identities in their commercial products;

d. Whether Defendants derived financial gain from their use of former NFL players' images and identifies in their commercial products;

e. Whether Defendants obtained or sought any reassurances from former NFL players that they would not bring suit for the Defendants' use of former players' images and identities in their commercial products;

f. Whether Defendants enjoy any First Amendment protection for the use of former NFL players' images and identities in their commercial products. Of note, the U.S. Court of Appeals for the Third Circuit, in *Hart v. Electronic Arts, Inc.*, stated this year in a class action case that "the putative class members all face the same issues with regard to the First Amendment...";

g. Whether Defendants were prejudiced in any legally significant way by any alleged delay in former NFL players filing suits against Defendants;

h. Whether Defendants' conduct violates New Jersey's common law preventing unfair competition;

i. Whether Defendants violate the Class Members' rights of publicity;

j. Whether Class Members have been damaged by Defendants' conduct;

k.    The amount of damages sustained by Class Members;

l.    Whether punitive damages are appropriate and the amount of such damages;

m.    The amount of profits made by Defendants due to their unlawful conduct;

n.    Whether Defendants should disgorge their unlawful profits.

o.    Whether Class Members are entitled to an accounting;

p.    Whether Class Members are entitled to injunctive relief; and

q.    Whether Class Members are entitled to declaratory relief.

214.    Plaintiffs' claims are typical of Class Members' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

215.    Plaintiffs will fairly and adequately protect the interests of the class. They will vigorously pursue the claims and have no antagonistic conflicts. Plaintiffs have retained counsel who are able and experienced class action litigators and are familiar with class action and intellectual property litigation including in the sports industry.

216.    Defendants have acted or refused to act on grounds that apply generally to the Class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. A class action is also appropriate because Defendants have acted and refused to take steps that are, upon information and belief, generally applicable to at least hundreds of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole. Questions of law or fact common to class members predominate over any questions affecting only individual members. Resolution of this action on a class-wide basis is superior to other

available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of Class Members to pursue their claims. It is not anticipated that there would be difficulties in managing this case as a class action.

217.    A number of judicial case management tools are available if the Court determines that they are advisable, such as the use of subclasses, pursuant to Federal Rule of Civil Procedure 23(c)(5), which states  that "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."

218.    Moreover, the Court may choose to employ Federal Rule of Civil Procedure 23(c)(4) which states:  "When appropriate, an action may be brought or maintained as a class action with respect to particular issues."

## VI.    NFL FILMS' ROLE IN THE PHILADELPHIA FEDERAL COURT CONCUSSIONS LITIGATION AGAINST THE NFL

219.    Presently pending in United States District Court for the Eastern District of Philadelphia, a few minutes from NFL Films' headquarters, is consolidated mass-tort litigation against the NFL and its subsidiary NFL Properties LLC captioned *In re National Football League Players' Concussion Injury Litigation*, Case No. 2:12-md-02323-AB, MDL No. 2323. Plaintiffs' Master Administrative Long-Form Complaint governs the thousands of individual cases filed by former NFL players.  Plaintiffs allege that "The NFL... was aware of the evidence and the risks associated with repetitive traumatic brain injuries virtually at the inception, but

deliberately ignored and actively concealed the information from the Plaintiffs and all others who participated in organized football at all levels."

220.     Plaintiffs there, in a section titled "The NFL Markets and Glorifies Football's Violence Through NFL Films," state the following:

> NFL Films focuses on violence as one of the NFL's greatest selling points: the football player as gladiator. To advance the NFL Defendants' purpose, NFL Films has created numerous highlight features that focus solely on the hardest-hits in pro football. These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

> The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles: "*NFL: Moment of Impact*" (2007); "*NFL's 100 Greatest Tackles*" (1995); "*Big Blocks and King Size Hits*" (1990); "*The Best of Thunder and Destruction – NFL's Hardest Hits*"; "*NFL Films Video: Strike Force*" (1989); "*The NFL's Greatest Hits*" (1989); "*Crunch Course*"; "*Crunch Course II*" (1988); "*Crunch Masters*"; "*In the Crunch*" (1987); "*NFL Rocks*"; "*NFL Rocks: Extreme Football*" (1993).

> NFL Films created the "*Top Ten Most Feared Tacklers*" series that was shown on the NFL Network. Now, it has its own section on the NFL's website. These features are comprised of videos highlighting the most vicious tacklers the NFL has ever seen. These videos contain numerous explicit examples of how the NFL Defendants market and glorify the violent nature of the NFL. The back cover of 2007 film "*Moment of Impact*" advertises the film as follows: "First you hear the breathing, then you feel the wind coming through your helmet's ear hole. Suddenly you're down, and you're looking through your helmet's ear hole. Pain? That's for tomorrow morning. Right now you've gotta focus – focus on the play and try not to focus on the next moment of impact."

> The entire message deemphasizes the acute and chronic risks associated with head impacts. The 1990 film "*Big Blocks and King Size Hits*" prominently features a head-to-head collision between Minnesota Vikings' defender Jack Tatum and Oakland Raiders' receiver Sammy White in Super Bowl XI in which White's helmet is knocked clear off his head. In 1993's "*NFL Rocks*," the late Junior Seau offers his opinion on the measure of a punishing hit: "If I can feel some dizziness, I know that guy is feeling double [that]." In a segment of the same film, glorifying gutsy receivers who expose themselves to big hits by going "over the middle" of the field, former Houston Oilers receiver Ernest Givens is quoted as saying: "I get knocked out a lot, I get concussions, I get broken noses, that

is part of being a receiver, that's what separates you from being a typical receiver than a great receiver." Former Dallas Cowboys receiver Michael Irvin recites a similar unawareness of the risks of concussions: "Before the game, I go to the [defensive backs] and tell them, 'Hey, you know I'll trade a concussion for a reception!'"

NFL Films, therefore, advances the NFL Defendants' agenda to promote the most violent aspects of NFL football and to urge players at every level of the game to disregard the results of violent head impacts.

The NFL Defendants strategically use NFL Films' cinematography and on-field microphones to exaggerate and emphasize vicious hits, which take on the appearance of the slow- motion crash test videos that appear in many car commercials, and the players taking on the role of the crash-test dummies.

The NFL Defendants, through NFL Films, promote a culture in which playing hurt or with an injury is both expected and acclaimed in a mythical gladiator world. Through NFL Films, the NFL has produced videos that praise players who embody the ethos of playing hurt (for example, *"Top Ten Gutsiest Performances"*). This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players must and often do play through any injury, including MTBI.

This culture encourages NFL players to play despite a head injury. Moreover, failure to play through such an injury creates the risk that the NFL player will lose playing time, a starting position, and possibly a career.

Within this culture, the NFL Defendants purposefully profit from the violence they promote. This culture of violence, sponsored and encouraged by the NFL Defendants, has too many examples to provide in this Complaint.

221.    The NFL argued before the Judicial Panel on Multidistrict Litigation ("JPML") in favor of transfer of all actions to Philadelphia, writing that "the Eastern District of Pennsylvania is a convenient forum for many plaintiffs, defendants and potential witnesses in the Actions.  The NFL is headquartered nearby in New York, New York (as is NFLP)."  The same is true in the present case with respect to New Jersey.

## VII.   TOLLING OF STATUE OF LIMITATIONS DUE TO DRYER CASE

222.   Any and all applicable statues of litigation have been tolled for Plaintiffs and Class Members during the pendency of the *Dryer v. NFL* litigation referenced herein.

## VIII.   COUNTS

All of the following claims are asserted by all Plaintiffs against both Defendants:

## COUNT I

### Violation of New Jersey Common Law of Unfair Competition

223.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

224.   Defendants NFL and NFL Films, as detailed above, have engaged in a wide-ranging calculated and systematic pattern and practice of widespread acts of unfair competition adversely affecting the interests of former NFL players.

225.   Defendants' acts include misrepresenting the nature of the rights that they obtained and possess regarding the use of their products; misrepresenting to business partners that Defendants have obtained the rights of Class Members; continuing to strike new business deals incorporating those misrepresentations; failure to seek and obtain valid consent and authorization from Class Members to use their images for promotion; failure to compensate Class Members for the use of their images; and creation of a false impression that Class Members endorse the NFL.

226.   Defendants' actions have harmed Plaintiffs, Class Members, and the public.

227.   Plaintiffs and Class Members are entitled to an award of compensatory damages.

228.   Defendants' conduct was malicious and/or Defendants acted in willful, wanton and willful disregard of Class Members' rights.  Defendants engaged in deliberate acts and/or

omissions with knowledge of a high probability of harm to others, namely, Class Members, who foreseeably might be harmed by those acts and/or omissions, and reckless indifference to the consequence of the acts or omissions.

229.    As such, an award of punitive damages is appropriate.

## COUNT II

### Violation of New Jersey Common Law
### Regarding Rights of Publicity

230.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

231.    Defendants have utilized and continue to utilize the images and identities of Plaintiffs and Class Members in NFL Films' promotional products without their consent and for NFL Films' and affiliated entities' commercial advantage.

232.    As a result of the misappropriation of their publicity rights, Plaintiffs and Class members have been injured.

## COUNT III

### False Endorsement, § 43(a) of the Lanham Act, 15 U.S.C. § 1125

233.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

234.    § 43(a)(1)(A) of the Lanham Act states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof…, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his

or her goods, services, or commercial activities by another
person …

shall be liable in a civil action by any person who believes that he
or she is or is likely to be damaged by such act.

235.    Defendant NFL uses the actual names of retired NFL players on its NFL website to promote the league, and on its NFL Films website catalog, among other places, to identify and solicit sales of its NFL products.

236.    Defendant NFL also uses the names, images, and likenesses of thousands of retired NFL players in its NFL Films productions, among other places, for the explicit purpose of promoting the NFL, increasing its brand awareness, and driving revenue to the NFL through product sales and consumer favor of the NFL over competing entertainment options.

237.    The NFL uses the actual names of retired NFL Players in connection with product descriptions and does so for the purpose of advertising and selling specific NFL Films videos and other products.  The NFL also uses the names, images, and likenesses of Plaintiffs and members of the Class in connection with promoting the NFL as a specific, consumable entertainment product.

238.    The names of the individual retired players the NFL uses to describe, advertise, and sell its products are highly recognizable to persons deciding whether to purchase Defendants' products.  Otherwise, the NFL would not select the individual players it does when promoting itself and its products.  The identities of the retired players the NFL features in its promotional NFL Films and other products are recognizable.  The names, images, and/or likenesses of all professional athletes are highly recognizable because of the popularity of professional sports.  Professional players also wear uniforms, numbers, and/or have readily identifiable movements, statements, or accessories (make-up or attire) making them readily

recognizable to consumers. Further, because NFL Films is a promotional enterprise, the NFL chooses athletes from the most recognizable situations in football's past to promote and endorse the league.

239. The NFL's motivation in producing NFL Films and featuring the names, images, symbols, and/or likenesses of retired NFL players is purely economic. The motivation is to sell NFL products, increase the NFL's brand power by trading on its past, and drive consumers to spend money on the NFL and its member teams instead of other entertainment options.

240. NFL Films does not simply use the names, images, symbols, and likenesses of retired NFL football players, to report the news or for historical pieces; the NFL uses retired players for promotional pieces intended to portray the NFL as an entertainment option, in the most positive light possible. At no point in any NFL Film does anyone criticize the NFL, as they would if it were a standard news or historical piece.

241. NFL Films may not be standard 30-second television advertisements, but they are intended to, designed to, and do serve the same promotional purpose. Similar to "infomercials," NFL Films are intended to focus consumers on the drama and intrigue of the NFL as a consumable entertainment product. Plaintiffs and members of the Class are the uncompensated stars of these promotional films.

242. Plaintiffs and members of the Class have legally protectable trademarks in their names, images, and likenesses. Plaintiffs and members of the Class own these trademarks outright. Any assignment of such rights made, for example, in their standard player contracts, expired with the expiration of such contracts.

243. The NFL's use of the names, images, symbols, and/or likenesses of Plaintiffs and members of the Class in its promotional NFL Films' productions and other products is likely to

create confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiffs as to the origin, sponsorship, or approval of the goods, services, or commercial activities by Defendant. Needless to say, Plaintiffs do not sponsor or approve of the goods and services for which the NFL is using their names, images, symbols, and/or likenesses without authorization.

244.    The NFL's use of the names, images, symbols, and/or likenesses of Plaintiffs and members of the Class in its promotional NFL Films' productions and other products creates an actual confusion concerning Plaintiffs' sponsorship or approval of those goods or services.

245.    As a direct and proximate result of Defendant's misconduct, Plaintiffs and members of the Class have suffered injury.

## COUNT IV

### Violation of Right of Publicity, California Civil Code § 3344

246.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

247.    The NFL and NFL Films have knowingly and intentionally used, and continue to use, the identities of Plaintiffs and members of the Class, including but not limited to their names, images, symbols, and/or likenesses, to advertise for and promote the NFL and to solicit purchases and sell products with revenue benefitting the NFL and its affiliated organizations.

248.    The NFL and NFL Films have done so without the valid consent and authorization of Plaintiffs and members of the Class.

249.    As a direct and proximate result of Defendants' misappropriation of their publicity rights, Plaintiffs and members of the Class have been injured in an amount to be proven at trial.

10376-11 629014V1

## COUNT V

### Violation of Right of Publicity, California Common Law

250.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

251.    Pursuant to the conduct described herein, the NFL and NFL Films have utilized and continue to utilize the identities of Plaintiffs and members of the Class, including but not limited to their names, images, symbols, and/or likenesses, without their consent and for Defendants' own advantage, commercial and otherwise.

252.    As a direct and proximate result of the misappropriation of their publicity rights, Plaintiffs and members of the Class have been injured.

## COUNT VI

### Violations of State Right of Publicity Statutory and Common Laws

253.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

254.    Plaintiffs have been, and continue to be, injured in all fifty states as a result of the misappropriation of their rights by use of the Internet, television and by other means.

255.    In addition to claims under the statutory and common laws of the states in which they reside, Plaintiff also assert claims under the statutes and common laws of all other states where their rights, and the rights of members of the Class, were violated.

256.    Defendant has violated Arizona common law protecting the right of publicity.

257.    Defendant has violated Alabama common law protecting the right of publicity.

258.    Defendant has violated Connecticut common law protecting the right of publicity.

259.    Defendant has violated Florida Stat. § 540.08.

260.    Defendant has violated Florida common law protecting the right of publicity.

261.    Defendant has violated Georgia common law protecting the right of publicity.

262.    Defendant has violated Hawaii common law protecting the right of publicity.

263.    Defendant has violated Illinois Rev. Stat. ch. 765 § 1075.1 *et seq.*

264.    Defendant has violated Illinois common law protecting the right of publicity.

265.    Defendant has violated Indiana Code § 32-26.

266.    Defendant has violated Kentucky Rev. Stat. §391.170.

267.    Defendant has violated Kentucky common law protecting the right of publicity.

268.    Defendant has violated Massachusetts Gen. Laws Ann. Ch. 214, § 3A.

269.    Defendant has violated Michigan common law protecting the right of publicity.

270.    Defendant has violated Missouri common law protecting the right of publicity.

271.    Defendant has violated Mississippi common law protecting the right of publicity.

272.    Defendant has violated Nebraska Rev. Stat. § 20-202.

273.    Defendant has violated New York Civil Rights Law § 51.

274.    Defendant has violated North Carolina common law protecting the right of publicity.

275.    Defendant has violated Ohio Rev. Code Ann. § 2741.01 *et seq.*

276.    Defendant has violated Ohio common law protecting the right of publicity.

277.    Defendant has violated Oklahoma Stat. tit. 12, § 1448, 1449.

278.    Defendant has violated Rhode Island Gen. Laws § 9-1-28, 9-1-28.1(a)(2).

279.    Defendant has violated Tennessee Code Ann. § 47-25-1102 *et seq.*

280.    Defendant has violated Texas Property Code § 26.011.

281.    Defendant has violated Utah Code Ann. § 45-3-1 *et seq.*

282.    Defendant has violated Utah common law protecting the right of publicity.

10376-11 629014V1

283.    Defendant has violated Virginia Code § 8.01-40.

284.    Defendant has violated Washington Rev. Code § 63.60.010 *et seq.*

285.    Defendant has violated Wisconsin Stat. §995.50(2)(b)

286.    Defendant has violated Wisconsin common law protecting the right of publicity.

287.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in each of these states.

## COUNT VII

### Unjust Enrichment

288.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

289.    Defendants have been unjustly enriched by obtaining money through unlawful means and at the expense of Plaintiffs.

290.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred by such ill-gotten income.

291.    Plaintiffs seek disgorgement of all of monies Defendants have obtained or derived from the unauthorized use of Plaintiffs' identities for promotional or commercial purposes.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That Defendants' actions be adjudged to be in violation of New Jersey's common law prohibiting unfair competition.

C.    That Defendants' actions be adjudged to be in violation of New Jersey's common law prohibiting violation of individuals' rights of publicity.

D.      That Defendants' actions be adjudged to be in violation of the federal Lanham Act;

E.      That Defendants' actions be adjudged to be in violation of numerous states' laws prohibiting violation of individuals' rights of publicity.

F.      That judgment be entered for Plaintiffs and members of Class against Defendants in the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs and expenses of this action, including reasonable attorneys' fees if appropriate;

G.      That Defendants be ordered to disgorge all profits earned via their practices of unfair competition as detailed herein;

H.      That Plaintiffs and Class members be awarded any available prejudgment and post-judgment interest;

I.      That Plaintiffs and Class members are entitled to Declaratory Relief declaring that Defendants do not have the right to use Plaintiffs' and Class Members' images in Defendants' promotional materials, and further declaring as void and unenforceable any of Defendants' license agreements that purport to represent that Class Members have released their rights and/or given their consent for the use of their images;

J.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing to use Plaintiffs' and Class Members' images without consent and compensation, and from continuing to represent that Defendant have obtained Plaintiffs' and Class Members' rights and consent when Defendants have not done so.

K.     That Plaintiffs and Class members have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

10376-11  629014V1

DATED:  August 20, 2013                    Respectfully submitted,

                                           PINILISHALPERN LLP

                                           By _____
                                              William J. Pinilis (2130)

                                           William J. Pinilis
                                           160 Morris Street
                                           Morristown, NJ 07960
                                           Telephone: (973) 401-1111
                                           Facsimile:  (973) 401-1114
                                           Email:  wpinilis@consumerfraudlawyer.com

                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           Steve W. Berman
                                           1918 Eighth Avenue, Suite 3300
                                           Seattle, WA  98101
                                           Telephone: (206) 623-7292
                                           Facsimile:  (206) 623-0594
                                           Email:  steve@hbsslaw.com

                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           Jon T. King (Cal. Bar. 205073)
                                           715 Hearst Ave., Suite 202
                                           Berkeley, CA 94710
                                           Telephone:  (510) 725-3000
                                           Facsimile:  (510) 725-3001
                                           Email:  jonk@hbsslaw.com

                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           Jason A. Zweig
                                           555 Fifth Avenue, Suite 1700
                                           New York, NY  10017
                                           Telephone:  (212) 752-5455
                                           Facsimile:  (917) 210-3980
                                           Email:  jasonz@hbsslaw.com

                                           BOB STEIN LLC
                                           Robert A. Stein (MN 104930)
                                           6473 Beach Road
                                           Eden Prairie, MN 55344
                                           Telephone: (952) 829-1043
                                           Facsimile: (952) 829-1040
                                           Email: rastein66@aol.com

10376-11 629014V1